James N. MILLER et al., Appellees,

v.

Richard H. YOUNG et al., Appellants.

No. 53457.

Supreme Court of Iowa.

May 6, 1969.

William McKinley, of Newman, Redfern, McKinley & Olsen, Cedar Falls, for appellants.

Dennis Damsgaard, of Christoffersen & Damsgaard, Cedar Falls, for appellees.

MASON, Justice.

In this law action tried to a jury plaintiffs seek recovery for property damages and personal injuries allegedly sustained as a result of defendants' negligence in the installation of heating equipment in the home plaintiffs occupied.

James N. and Doris Miller and their five minor children are plaintiffs. Defendants are owners and operators of Young Heating Company or Young Plumbing and Heating Company and their employee Paul Canfield. Ownership of the company was widely spread among the members of the Young family in 1963. Neither this diversity of ownership nor the fact that at different times the business of the company had been carried on in two different names is significant here.

For simplification the business entity and defendants-owners will be referred to as Young. Relevant business dealings with Young and Canfield were conducted entirely by the principal plaintiff James N. Miller, hereafter referred to as Miller.

References to other plaintiffs will be made by their specific names.

As each plaintiff makes a separate claim, the case involves seven different actions for damages. Defendants' liability, if any, rests on the same basis as to each plaintiff.

I. The trial court withdrew the issue of damages for permanent injury, future pain, all claims for medical expense, past, present and future, and loss of earnings. The only elements of damages submitted to the jury were pain, suffering and discomfort of each plaintiff between October 1, 1963 and September 29, 1964, and damages to paneling in the basement recreation room not to exceed $2,673.07.

The jury returned verdicts of $14,848.91 for the father-husband, $10,000 for the mother-wife and $2000 for each child.

The trial court overruled defendants' motions for judgment notwithstanding the verdict as to all plaintiffs and overruled their motion for new trial as to the five plaintiff children and to Mr. Miller if he filed a remittitur of all of his judgment in excess of $8763.07 and as to Doris Miller, if she filed a remittitur of all her damages in excess of $8000—reductions of $6175.84 and $2000 respectively.

The remittiturs were filed and defendants appeal, asserting error in overruling their motions for directed verdict, judgment notwithstanding the verdict and new trial.

II. After Miller bought this house in July 1963, he discovered it needed many repairs. He had it completely redecorated so it would be equivalent to a brand new house and contracted with Young for installation of air conditioning units, two new furnaces and two new hot water heaters in the months of August, September and October, 1963. Defendant Canfield handled the contract between Miller and Young. When the Miller family moved into the new house about October 8, 1963, Young's work had been completed. At first they used the air conditioner which worked fine, and the heat later in the fall as needed. As soon as the heat came on to any appreciable extent, water started condensing on the lowest tier of windows and moved up approximately six feet.

When the heat first came on in the fall of 1963 Doris Miller thought she could smell gas. Miller testified he didn't think she could, although he could smell a faint odor.

When these conditions persisted Miller called Canfield a number of times at his office and home. Canfield came to the Miller home only once but on other occasions told Miller to disregard the slight odor and the water vapor. Because of other work done by Young in Miller's office and other home, he had complete reliance on Canfield's competency and thought the water vapor would disappear. Canfield made recommendations which failed to cure the problem and it became more pronounced early in 1964.

Miller described in detail the condition caused by the water vapor. Since defendants concede their negligence was a cause of excessive moisture in the home as will appear hereinafter, we will not describe this result further.

Miller testified that in the fall of 1963 and early months of 1964 there was a "skunky" odor in the house but not the odor of heating gas. He felt he was being afflicted with the family laziness, was lethargic and slowed up appreciably, slept at odd times during the day when he was home, slept longer than usual or has since. During this period he had a general "blah" feeling, headaches and didn't feel attentive. He felt fine during the summer of 1964, his health problem was only during the heating season; when the faulty installation was discovered and corrected sometime after September 29, 1964, he went back to sleeping the usual number of hours, his headaches cleared up and the lethargic feeling disappeared.

Miller described the children's condition as about the same except they were cranky and irritable, slept much longer and those who were articulate complained of headaches which was abnormal for these healthy children.

Doris testified that between October 1, 1963 and September 29, 1964, she didn't feel well, had chest pains and stomach cramps, dropped out of her clubs or organizations, didn't feel well and neither did her children. She described their vomiting as passing from one child to the other weeks apart, the condition as a constant nightmare and mess, the children as cranky, with the oldest complaining of headaches. Although she had headaches, they were nothing compared to her chest pains and stomach cramps.

Doris went to the doctor for the chest pains but he found nothing organically wrong.

She testified that the night of September 27, 1964, she smelled gas and persuaded Miller to call Iowa Public Service. They came out, found a small leak which they fixed and told Millers not to worry if they smelled a little gas as it would lurk in the corners a day or so.

September 29 she got three of the children off to school, awakened her husband who had fallen asleep reading the newspaper, dressed the two younger children and put them in the living room to play. After Miller left, Doris went about her kitchen work. When she couldn't hear the children talking—the little boy was five, the little girl 1½ and both were usually quite noisy— she went into the living room to check on them. She then had a tremendous headache. The children were both asleep on the floor. She helped the boy and carried the girl outside, put them on some summer furniture. The boy woke up, told his mother he had to vomit and wanted a towel. When she went back into the house Doris realized the odor in the air was overpowering and made her sicker than she already was. She asked a neighbor to look after the children while she called Iowa Public Service and opened the doors and windows.

After the utility representative came to the house and the improper venting of the heating equipment was later corrected, the problems of the headaches and the children's sickness cleared up. Doris had never suffered from chest pains, stomach cramps and headaches before the heat was turned on.

Mrs. Miller detailed the discomfort and suffering caused her and the family by the excessive moisture in the home. The whole affair had caused her to become apprehensive and nervous, although there had been some improvement at time of trial.

Dr. William C. Drier, a general practitioner in Waterloo since 1956 who had been the Miller family doctor for approximately 10 to 15 years, testified asphyxiation is a lack of oxygen circulating in the blood stream and could be from several causes. He explained the dependency of all body tissues upon oxygen for their normal function, the affinity of carbon monoxide for hemoglobin, and indicated if a person were to inhale some air that contained both oxygen and carbon monoxide the hemoglobin would pick up the carbon monoxide first.

Dr. Drier described the primary symptoms of people who have inhaled carbon monoxide as "headaches, dizziness, generalized fatigue, easy fatigability, some nausea, vomiting, depending upon the percentage of the degree of asphyxiation; later on, perhaps, convulsions and then they are comatose, unconscious;" any minute amount of carbon monoxide in the air would cause a simple headache, more would be required to create fatigue.

When he had seen Doris between September 1963 and September 1964, she complained of chest pains, some nausea, shortness of breath and abdominal pains. He referred her to Mayo Clinic but they found no organic disease.

In a hypothetical question the doctor was asked whether, assuming in connection with complaints made by her to him, Doris Miller

was at various times between September 1963 and September 1964 exposed to carbon monoxide, had inhaled some carbon monoxide gas even in small amounts, he had an opinion based on reasonable medical certainty as to the connection of her complaints with inhaling carbon monoxide gas. He testified it is possible these symptoms could have been due to inhalation of a gas of some sort and in retrospect it is possible and probable.

In another hypothetical question the doctor was asked to assume that during the period involved the children were inhaling even small quantities of carbon monoxide gas and suffering from headaches, lethargy and general dullness. He was then asked if he had an opinion whether these symptoms could be caused by inhalation of small quantities of carbon monoxide gas.

The doctor had not seen the children in connection with these complaints but testified if the children exhibited these symptoms and if there was definite evidence of carbon monoxide in the air, it is both possible and probable their symptoms could have been referable to that gas.

Canfield did not inspect the chimney of the Miller home prior to the installation or know the size or type of the flue liner or that it contained a condensing box. He had failed to consider capacity of the boiler used to heat the solarium.

Francis F. Halbmier, superintendent of Iowa Public Service, testified he was called to the Miller home September 29, 1964, to check a gas heating venting, and described the faulty installation of the heating equipment which could cause spillage when the furnaces were started up. His inspection disclosed some products of combustion were not going up the chimney and spillage on the draft hood because of improper venting. We are told the draft hood is that part of the appliance which mixes fresh air with the combustion products to discharge through a vent or chimney. With all units operating there was spillage which might not be detected by the ordinary person although others would notice it right away. In his opinion the lack of combustible air in this installation could be dangerous.

This witness described the products of gas, the effect of having spillage in the furnace room which produces carbon monoxide over a period of time.

No effort was made to contradict or discredit this witness' testimony.

The Waterloo heating inspector found some spillage from the diverter September 30, 1964, which he said meant all its venting fumes were not going up the chimney and the flue gases were spilling back into the furnace room. He explained that flue gases are made up of carbon dioxide including a certain amount of water vapor, the flue gases in the furnace room could have then been used over for combustion of gas and when this happened it made carbon monoxide, a deadly gas. He found a lack of air in the basement. Later he inspected the duct work which had been installed to bring outside air into the furnace room and at that time everything was working properly.

III. Defendants first assign error in the overruling of their motions for directed verdict at the close of plaintiffs' evidence and renewed at the close of all evidence. In these motions defendants asserted plaintiffs had failed to establish (1) defendants' negligence, (2) breach of contract and (3) defendants' installation of the heating equipment caused carbon monoxide in the home.

The cause was submitted to the jury as a negligence case. Defendants in their written statement of the case identify it as an action in tort and concede the evidence generated a jury question as to their negligence in installation and inspection of the two furnaces and two hot water heaters as a cause of excessive moisture in the home. They assert only the third ground for review.

Under their first brief point in support of this assignment defendants assert there

was (1) no competent medical testimony that plaintiffs' illness was caused by carbon monoxide and (2) failure to prove the extent of personal injury damages.

■ In support of the ruling plaintiffs contend the grounds set out in this brief point were not urged in defendants' motions for directed verdict but were first presented in their motion for judgment notwithstanding the verdict and therefore may not be considered here. Plaintiffs' position must be upheld.

"We have frequently held a motion to direct may not be supported upon appeal by a ground not urged in the trial court. * * These precedents merely apply the familiar rule that an appellant may not urge for the first time here a contention not raised in the trial court. * * * [Citing authorities]." Frederick v. Goff, 251 Iowa 290, 296, 100 N.W.2d 624, 628. See also Jensvold v. Chicago Great Western R. Co., 236 Iowa 708, 715, 18 N.W.2d 616, 619; Markman v. Hoefer, 252 Iowa 118, 122, 106 N.W. 2d 59, 62; Mundy v. Olds, 254 Iowa 1095, 1100, 120 N.W.2d 469, 472–473; Tice v. Wilmington Chemical Corp., 259 Iowa 27, 34–35, 141 N.W.2d 616, 621, 143 N.W.2d 86; Jones v. Iowa State Highway Commission, Iowa, 157 N.W.2d 86, 92, and authorities cited in these opinions.

■ An error not assigned presents no question for review and need not be considered upon appeal. Weimer v. Lueck, 234 Iowa 1231, 1239–1240, 15 N.W.2d 291, 295; Osbey v. Nelson, 248 Iowa 571, 573, 81 N.W.2d 449, 451; and Elkin v. Johnson, Iowa, 148 N.W.2d 442, 444.

In view of defendants' concession on the issue of negligence and the fact the court submitted the matter as a negligence case this contention need be considered only as to the assertion plaintiffs failed to establish that defendants' negligence caused carbon monoxide to be circulated in the home.

Rule 243(b), Rules of Civil Procedure, provides:

"(b) If the movant was entitled to have a verdict directed for him at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant."

Friedman v. Colonial Oil Co., 236 Iowa 140, 145, 18 N.W.2d 196, 199, is directly in point. We quote:

■ "The purpose of Rule 243(b) is to give the trial court an opportunity to correct its error in failing to sustain a motion for directed verdict. Here the motion for judgment was based upon a proposition not raised in plaintiff's motion for directed verdict. The situation was the same as though plaintiff had made no motion for directed verdict. Under the circumstances plaintiff had no right to the remedy which Rule 243(b) affords to a litigant whose motion for directed verdict has been erroneously overruled."

Other precedents for the proposition that defendants' motion for judgment could not properly be sustained on a ground not asserted in their motions to direct verdict include Sullivan v. First Presbyterian Church, Waterloo, 260 Iowa 1373, 1376, 152 N.W.2d 628, 631, citing Siebert v. State Farm Mut. Ins. Co., 251 Iowa 1060, 1063, 103 N.W.2d 757, 758–759, and citations; Comer v. Burns, 255 Iowa 251, 256, 122 N.W.2d 305, 309.

However, defendants maintain grounds asserted under this brief point were urged at the close of all evidence by motion to strike from the jury's consideration "asphyxia due to carbon monoxide poisoning, there being no showing of any carbon monoxide present at this home, nor no medical testimony, relative to there being any carbon monoxide poisoning of these parties, and (b), there is no showing of any damage * * *."

■ Assuming arguendo plaintiffs did thereby reach the grounds asserted in this brief point, there is another reason why

this assignment of error cannot be sustained. "In considering the sufficiency of the evidence of defendant's negligence as against its motions for directed verdict and judgment notwithstanding the verdict, we view the evidence in the light most favorable to plaintiff. This is the effect of Rule 344(f), par. 2 Rules of Civil Procedure." Ling v. Hosts, Inc., Iowa, 164 N.W.2d 123, 124. It is likewise viewed when appeal is taken from judgment on verdict for plaintiff. We need consider only the evidence favorable to plaintiff whether or not it is contradicted. Hall v. Wright, Iowa, 156 N.W.2d 661, 668–669, and citations. See also Lewis v. Baker, 251 Iowa 1173, 1177, 104 N.W.2d 575, 577.

■ Our function is to review the evidence to determine, not whether it proves defendants' negligent installation and inspection of the heating equipment caused carbon monoxide gas to be circulated in the Miller home, but whether it is sufficient so the trial court was justified in submitting the question to the jury as the trier of the facts. Kregel v. Kann, 260 Iowa 1330, 1336, 152 N.W.2d 534, 538; Van Aernam v. Nielsen, Iowa, 157 N.W.2d 138, 142; and Brandt v. Richter, Iowa, 159 N.W.2d 471, 474.

As previously noted, defendants concede there was a jury question presented on the issue of their negligence in installation and inspection of the heating equipment. There is evidence this faulty installation caused spillage when the furnaces were started and the effect of spillage in the furnace room was to produce carbon monoxide, a deadly gas; the installation caused a lack of combustible air in the basement which was corrected when Young installed ducts to bring outside air into the furnace room; after this correction the heating equipment worked properly and plaintiffs' complaints disappeared.

■ The jury was justified in finding defendants' conduct caused the presence of monoxide gas in the Miller home.

Defendants were not entitled to a directed verdict.

IV. One contention defendants make in their other assignment is that the court erred in overruling their motion for judgment notwithstanding the verdict. The court overruled this motion on all grounds stated in its ruling on motions to direct made during the course of trial.

■ We have held in Division III, supra, they were not entitled to directed verdict. It necessarily follows they were not entitled to judgment notwithstanding. See rule 243(b), R.C.P., supra.

V. Defendants' remaining contentions involve overruling their motion for new trial. Their statement of errors contains nine subparagraphs covering grounds asserted as materially affecting their substantial rights. They may be thus summarized: (1) the verdict was excessive, (2) error in overruling motion to remove personal injury claims from jury consideration, (3) error in failing to strike the word "inconvenience" from instruction 12 and (4) misconduct of the jury.

We consider these contentions otherwise than in that order.

■ On consideration of defendants' second contention included in this assignment we conclude defendants' motion was limited to striking permanent injury claims, past and future medical expenses, and future pain and suffering. The relief asked for was granted and defendants cannot complain the court erred in not granting them more relief than prayed for.

■ VI. Defendants are not entitled to have any claimed errors in instruction 12 considered since no objection to it was made on the trial within the time required by rule 196, R.C.P. Smith v. J. C. Penney Company, 260 Iowa 573, 587, 149 N.W.2d 794, 803.

■ VII. In Division II of their motion for new trial defendants assert jury

misconduct. This contention was presented by counsel's affidavit incorporating an unsworn statement of a juror. Although the court determined this constituted a non-permissible attempt to impeach the verdict, it still gave the affidavit limited consideration on their claim of excessiveness of verdicts.

"[A]ffidavits of jurors may not be used to show their reasons for assenting to the verdict, or that they did not assent to it, or it was not the result of their deliberate judgment, or they did not understand the court's instructions since all these matters inhere in the verdict. * * * [Citing authorities]." Oakes v. Peter Pan Bakers, Inc., 258 Iowa 447, 457, 138 N.W.2d 93, 100.

In Rancho Grande, Inc. v. Iowa State Highway Comm., Iowa, 156 N.W.2d 293, 298, is this:

"The grounds upon which the jurors assent to the verdict, where there has been no misconduct in bringing extraneous matters to the jurors' attention can not be shown to impeach it, nor is it competent in this way to show the jury misunderstood the law which was correctly stated in the instructions. * * * [Citing authorities].

"In Long v. Gilchrist, 251 Iowa 1294, 1300, 105 N.W.2d 82, 86, we quote this from Wright v. Illinois and Mississippi Telegraph Co., 20 Iowa 195, 210: 'That affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself: as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or by game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror

did not assent to the verdict; that he misunderstood the instructions of the court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow jurors, or mistaken in his calculations of judgment, or other matter resting alone in the juror's breast.'

"The mass of back-and-forth arguments which no doubt occur in the jury room prior to the verdict are matters which inhere in the verdict although they oftentimes roam far afield. If we were to analyze and review and sometimes reject as misconduct all arguments and discussions in a jury room, there would never be a finality as to jury verdicts."

The contention is without merit.

VIII. In considering defendants' remaining contention that the verdict is so excessive as to shock the conscience and show it is the result of passion and prejudice we must take the evidence in the aspect most favorable to plaintiff which it will reasonably bear. We must also give weight to the fact the trial court, with the benefit of seeing and hearing the witnesses, observing the jury and having before it all the incidents of the trial, did not see fit to interfere beyond ordering remittiturs from the $14,848.91 verdict in favor of Miller of all in excess of $8763.07 and from the $10,000 verdict in favor of Doris of all in excess of $8000. On failure to so remit a new trial was granted. The remittiturs were filed. Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 718, 107 N.W.2d 85, 92.

Although the verdicts were generous, they were not excessive as thus reduced.

In ruling on defendants' motion for new trial the court observed there was no indication of passion, prejudice, or failure to respond to the real merits of the controversy. We are satisfied the verdicts did not result from passion or prejudice.

However, we will also interfere with a verdict, because of its size, where it is lacking in evidential support although there may be no passion or prejudice. See special concurring opinion Allen v. Lindeman, 259 Iowa 1384, 1399-1401, 148 N.W.2d 610, 620.

In Mazur v. Grantham, 255 Iowa 1292, 1303, 125 N.W.2d 807, 813-814, we said:

"In considering the size of verdicts we have repeatedly referred to passion and prejudice, shock the conscience, failure to administer substantial justice, the rule of fair compensation, and lack of support in the evidence. (Citations) It seems fundamental the most important of these is support in the evidence. If the verdict has support in the evidence the others will hardly arise, if it lacks support they may all arise. The real question in most cases, and here, is the amount and sufficiency of evidence to support the award made. Certainly where the verdict is within a reasonable range as indicated by the evidence the courts should not interfere with what is primarily a jury question." See also Mabrier v. A. M. Servicing Corporation of Raytown, Iowa, 161 N.W.2d 180, 183; Wilson v. Jefferson Transportation Co., Iowa, 163 N.W.2d 367, 374.

However, the original judgments in favor of Miller and his wife entered upon the verdicts as directed by rule 223, R.C.P., are to be deemed reinstated upon defendants' appeal. Castner v. Wright, 256 Iowa 638, 658–659, 127 N.W.2d 583, 128 N.W.2d 885. This is the effect of rule 250, R.C.P., as amended, which provides:

"Conditional new trial. The court may permit a party to avoid a new trial under rule 243 or 244 by agreeing to such terms or conditions as it may impose, which shall then be shown of record and a judgment entered accordingly.

"Any such term or condition or judgment entered pursuant thereto shall be deemed of no force and effect and the original judgment entered pursuant to rule 223 shall be deemed reinstated in the event of an appeal."

In Castner we said, " * * * We have the inherent right to order a remittitur and modify the award to such sum as we deem just." Accordingly, it is ordered that if Miller files in the office of the clerk of this court within thirty days from and after the filing hereof, a remittitur of so much of his judgment entered in the trial court for $14,484.91 as exceeds $8763.07 with interest from the date said judgment was originally entered at 5 percent per annum, and costs, the judgment shall stand affirmed as so modified. If such remittitur is not so filed, a new trial is hereby ordered. Under the same conditions if Doris Miller shall file a remittitur of so much of the judgment entered in her favor in the trial court for $10,000 as exceeds $8000 with interest and costs as above provided, her judgment shall stand affirmed as so modified, failing to file such remittitur, a new trial is hereby ordered on her claim. See Hall v. Wright, supra, Iowa, 156 N.W.2d at 670-671.

As so modified we hold the verdicts in favor of Miller and Doris are sufficiently supported by the evidence to preclude further interference by this court.

Judgments rendered on verdicts in favor of each of the five children are sufficiently supported by the evidence and are affirmed.

The case is therefore

Modified and affirmed on condition, and remanded.

All Justices concur, except BECKER, J., who concurs in the result.

BECKER, Justice.

I concur in the result and in all portions of the opinion except for the portion giving approval to "lack of support in the evidence", as a ground for review of the amount of damages awarded. See dissent in Oldsen v. Jarvis, Iowa, 159 N.W.2d 431, 437.