Robert JACOBSON, Appellee,

v.

BENSON MOTORS, INC. and General
Motors Corporation, Appellants.

No. 55842.

Supreme Court of Iowa.

March 27, 1974.

Rehearing Denied April 18, 1974.

Prichard, Hanson, Doran & Bormann, Emmetsburg, for appellant General Motors Corp.

Charles H. Barlow, Emmetsburg, for appellant Benson Motors, Inc.

Fitzgibbons Brothers, Estherville, for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, REES and McCORMICK, JJ.

RAWLINGS, Justice.

Appeal by defendants Benson Motors, Inc. (Benson) and General Motors Corporation (GM) from judgment on jury verdict for plaintiff Robert Jacobson (Jacobson) in action for damages arising from claimed breach of warranties by both defendants and negligence on Benson's part. We reverse.

Our review is on errors properly assigned and argued. See Iowa R.Civ.P. 344(a)(3), The Code 1971. But see Iowa R.Civ.P. 344(a)(2), The Code 1973. While there must be some substantial evidence on which to submit an instruction, all relevant and material evidence, including justifiable inferences favorable to plaintiff must be accepted at face value in determining whether a jury issue is created. Also, our function is not to weigh the testimony but to determine whether substantial evidence was presented upon which a jury could find for plaintiff. And in that regard we view the evidence in a light most favorable to the party prevailing in trial court. See Claude v. Weaver Construction Co., 261 Iowa 1225, 1228, 158 N.W.2d 139 (1968).

Mindful of the foregoing we turn now to the factual situation disclosed by the record.

August 2, 1968, Jacobson placed an order with Benson, a GM dealer in Emmetsburg, for the purchase of a 1968 Chevelle Super Sport 396.

August 15th Jacobson received the car for which he, as best determinable, paid Benson about $4000. It was raced seven or eight times that fall. Sometime in October or November Benson offered to sponsor Jacobson in his racing endeavors but the proffer was not accepted.

Also in the fall of 1968 plaintiff encountered heating problems with the Chevelle. He took it to Benson several times but the fault was never corrected.

In January 1969, while being driven between towns, the vehicle developed a radiator hose leakage. It was then nighttime and the temperature 20 degrees below zero so plaintiff, assuming there was sufficient water in the radiator, drove into town.

Replacement of the leaking hose and addition of antifreeze failed to remedy the heating situation. Plaintiff thereupon returned his Chevelle to Benson for repairs under the warranty which had then come to his attention for the first time.

Initially Benson denied there was any such coverage because of asserted engine abuse. Jacobson and Benson then talked by phone with a GM representative. He instructed Benson to effect a warranty covered repair of the Chevelle engine. This representative also stated that if the motor was so repaired it would no longer be under warranty.

Thereupon Jacobson asked Benson whether the existent 350 h. p. motor could be replaced by a totally new 375 h. p. engine. Benson said it could be done and in such event the replacement would be under

full warranty. Jacobson was also advised he would be required to pay the difference over for a new increased power engine plus necessary parts and labor.

Benson was then told by Jacobson he wanted a new block and 375 h. p. motor but "more or less left everything to Benson up to the best of his knowledge to get it running." Jacobson also testified he relied on Benson's judgment.

March 16, 1969, plaintiff called for his newly motorized Chevelle and was told it was ready, except for a tune-up but Benson had no mechanics trained for that job. Jacobson offered to do the work himself. After such tuning the car operated satisfactorily. That night, however, the weather turned quite cold. Resultantly the block and radiator froze completely. When inquiry was made Benson stated, "someone called down and said not to put antifreeze in it." Nevertheless Benson charged GM for two quarts of antifreeze in connection with the motor replacement under warranty project.

After Jacobson had thawed the engine it ran well for 10 or 11 days then the motor locked and would not run. When plaintiff asked Benson to pick up the car the latter refused and stated there was no warranty.

Jacobson and a friend, Kenneth Hansen, then took the engine apart and discovered Benson had not put in a new block. Furthermore, marks on the top of the new high dome 375 h. p. pistons were also discovered.

The engine was then taken to Bradshaw & Short, a GM dealer in Estherville. Jacobson and Hansen were there advised by a mechanic the pistons for a 375 h. p. motor would not work in plaintiff's unreplaced 350 block.

Plaintiff and his friend then went to Benson Motors, looked at the repair work parts "shop order" and found a new block had not been ordered. In response to an inquiry directed to him Carl Benson stated a new block had been installed in Jacobson's Chevelle. When asked why it was not covered by warranty Benson replied to the effect he did not know. Hansen further asked whether "375 pistons would work with the heads that were left on it" to which Benson responded in the affirmative. When Hansen said he and Jacobson had already stopped at the aforesaid GM agency in Estherville they were told by Benson "to get the hell out of his office and stay out".

Thereafter plaintiff and Hansen repaired the engine.

May 5, 1969, the instant action was commenced.

As best we can determine the jury found for plaintiff against GM and Benson for breach of warranty and against Benson alone for negligence, then determined Benson was also liable to plaintiff for punitive damages.

In this joint appeal defendants rely on ten asserted errors. More specifically they contend trial court erred (1) in admitting evidence as to (a) cost of vehicle repairs and loss of use, (b) advertisements purportedly showing specifications for vehicles other than that here involved, (c) a newspaper article; (2) in failing to direct a verdict for Benson on the basis of plaintiff's contributory negligence; and (3) in submitting to the jury instructions regarding (a) express warranty, (b) implied warranty of fitness for a particular purpose, (c) damages, (d) punitive damages as to Benson, (e) existence of an agency relationship between GM and Benson and (f) negligence on Benson's part.

These assignments will not be entertained in the order presented.

██ I. Did the introduction in evidence of a newspaper article constitute reversible error? Ordinarily newspaper articles are not admissible as proof of their contents. See Rotman v. Hirsch, 199 N. W.2d 53, 55 (Iowa 1972) and citations.

This is because such articles generally constitute evidentially impermissible hearsay. See Rotman v. Hirsch, *supra*; Fanning v. Mapco, Inc., 181 N.W.2d 190, 197 (Iowa 1970); 32 C.J.S. Evidence § 726. They are also commonly subject to the best evidence rule. See 4 Wigmore on Evidence, § 1174 (Chadbourn rev. 1972); McCormick on Evidence, §§ 195–198 at 408–411 (1954); 29 Am.Jur.2d Evidence, § 448.

On the other hand a newspaper article may be admitted in evidence for some limited purposes, including imputation to a party of a commonly known fact. See Fanning v. Mapco, Inc., *supra*; 2 Jones on Evidence, § 12:30 (6th ed. Gard.1972); 32 C.J.S. Evidence § 726.

In resolving the issue at hand we look first to the underlying factual situation.

During trial John Dodson, a service manager for Chevrolet Motor Division was called as a defense witness. Under cross-examination he stated:

"On the average, General Motors doesn't have a lot of trouble with Chevelles, 1965, 1966, 1967 and 1968. * * * I have seen nothing as far as notification to General Motors from the National Highway Traffic Safety Administration concerning fixing engine mountings on 1965 through 1969 Chevelles."

There followed these questions by plaintiff's attorney and Dodson's answers thereto:

"Q. I hand you what Mr. David marked Plaintiff's Exhibit T which is last Sunday's Register and call your attention to the article on the front page which indicates that the National Highway Traffic Safety Administration required G.M. to bring in some hundreds of thousands of these Chevelles, 1965 through 1969 because the engines weren't put on right, isn't that the substance of the article? A. (No response.)

"Q. That's the substance of that article, isn't it, Mr. Dodson? A. Could I have the question restated, please, or reread?

"Q. Isn't the effect of that article a notification by the National Highway Traffic Safety Administration to G.M. demanding that they take these machines back, these Chevrolets back to the dealers and get the engine mountings corrected?"

At this point defense counsel objected for the reason Exhibit T was not the best evidence; secondary in nature; incompetent, irrelevant and immaterial.

Thereupon plaintiff's attorney declared:

"Your Honor, the article plainly states in Sunday's Register that the engine mount defects have caused vibrations in the engine and the way I understand it, lock up the engine just like this did, and there have been hundreds of thousands of them that G.M. put out that do that."

Trial court then overruled all objections and admitted Exhibit T in evidence.

At the outset the foregoing declaration by plaintiff's attorney discloses the newspaper article was introduced in evidence as proof of its content.

Next, it was clearly subject to defendants' "not the best evidence" objection. Furthermore, Exhibit T purportedly dealt extensively with the National Highway Traffic Safety disclosure of *defective motor mounts* on GM cars, including Chevelle, which were found to cause partial or total loss of vehicular control. Significantly no such issue is instantly involved. Consequently defendants' objection on the grounds of irrelevancy and immateriality was appropriate. See State v. Clay, 213 N.W.2d 473, 477 (Iowa 1973); Rotman v. Hirsch, *supra*.

Finally, the erroneously admitted front page Des Moines Register article with which we here deal was patently prejudicial to defendants.

Consequently, upon the issue at hand, this case must be reversed on both appeals and remanded for a new trial.

Under these circumstances we shall entertain such of defendants' remaining assignments as are likely to arise again on retrial. It is understood, however, such review is confined to the factual situation disclosed in course of the trial from which this appeal stems. Moreover, we shall confine our review to errors here urged, to the exclusion of multiple facets of the case not dealt with during trial.

II. Next considered is plaintiff's argument to the effect trial court erred in submitting an instruction as to existence of an agency relationship between GM and Benson.

At the threshold this court has aptly stated:

"The burden of proving a principal and agent relationship is upon the party asserting such relationship. Martin v. Jaekel, 188 N.W.2d 331, 333 (Iowa 1971). In the cited case the court repeated this statement from Pay-N-Taket, Inc. v. Crooks, 259 Iowa 719, 724, 145 N.W.2d 621, 624:

"'An agency results from the manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to his control, and consent by the other so to act. * * * [citing authorities]

"'An agency may be proven not only by direct evidence of an agreement between the parties but also by circumstantial evidence, such as their words and conduct, from which an intention to create an agency may be fairly implied. * * * [citing authority] The question of whether there was a principal-agent relationship ordinarily is one of fact. * * * [citing authority].'" Ioerger v. Schumacher, 203 N.W.2d 572, 575–576 (Iowa 1973).

In support of its position GM argues, absence of agency is disclosed by terms of the agreement with Benson, and its lack of control over the dealer. That argument is effectively refuted by this statement in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 78 (1960):

"Although the franchise agreement between the defendants recites that the relationship of principal and agent is not created, in particular transactions involving third persons the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation. Restatement (Second), Agency § 27 (1958)."

See also Hoffman Motors Corporation v. Alfa Romeo S.p.A., 244 F.Supp. 70, 76–77 (S.D.N.Y.1965); 3 Am.Jur.2d, Agency, § 21.

Looking now to the other side of the coin Jacobson points to Carl Benson's testimony which discloses (1) he must maintain books prescribed by GM; (2) he cannot move his place of business absent approval by GM; (3) his books are audited by GM; (4) he must maintain the minimum capital required by GM; (5) his financial status is continually reviewed by GM; and (6) his charges for warranty covered work are dictated by GM.

Plaintiff also refers to Dodson's testimony which reveals this GM representative authorized warranty covered repair work on Jacobson's Chevelle; directed Benson to make the repairs; and GM paid Benson for a substantial part of the motor replacement.

In light of the foregoing we find no error on the part of the trial court in submitting the agency issue to the trial jury.

III. Defendants also here assert plaintiff failed to establish a cause of action for breach of express warranty. In support thereof they contend trial court erroneously overruled their motion for a directed verdict and submitted a related instruction to the jury.

As to appellate review regarding a directed verdict motion this court said in Anderson v. Lyon County, 206 N.W.2d 719, 720 (Iowa 1973):

> "In considering the propriety of a motion for directed verdict the court views the evidence in the light most favorable to the party against whom the motion was made. Rule 344(f)(2), Rules of Civil Procedure. A movant for a directed verdict may be considered as admitting the truth of all evidence offered by the adverse party and every favorable inference which may be fairly and reasonably deducted therefrom. (Authorities cited)."

See also Adams v. R. S. Bacon Veneer Company, 162 N.W.2d 470, 471 (Iowa 1968); Iowa R.Civ.P. 344(f)(2).

The basic question now posed is whether the express warranty issue should have been submitted to the jury.

■ To the extent here applicable Court's Exhibit 1 provides, in essence, GM warrants the car to be free from defects in material and workmanship under normal use and service. This was clearly an express warranty. See Code § 554.2313.

But that warranty purportedly excluded (1) implied warranty of fitness for a particular purpose; (2) any vehicle subject to misuse, neglect or alteration; and (3) any vehicle repaired by other than a Chevrolet dealer if, in GM's judgment, the repairs adversely affected car performance.

Briefly stated, the record at hand discloses the aforesaid exclusions were not at any time called to plaintiff's attention. See Dailey v. Holiday Distributing Corp., 260 Iowa 859, 869–870, 151 N.W.2d 477 (1967) and citations; Matthews v. Ford Motor Company, 479 F.2d 399, 403 (4th Cir. 1973); Koellmer v. Chrysler Motors Corporation, 6 Conn.Cir. 478, 276 A.2d 807, 810–811 (1970); Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112, 116–117 (La.1973); 1 Anderson on Uniform Commercial Code § 2–316:4 (1970).

■ Trial court also determined the exclusions, *supra,* were not sufficiently conspicuous. See Code § 554.1201(10). No issue as to that holding is raised on this appeal.

It therefore follows the warranty exclusions referred to above were devoid of any force or effect.

IV. Defendants also contend the admission in evidence of several Chevelle Super Sport 396 magazine advertisements gives cause for reversal.

These ads were carried in 1967, 1969 and 1970 issues of some relatively well-known publications having general circulation. Noticeably, Jacobson purchased a 1968 model Chevelle.

When the exhibits instantly involved were offered in evidence defendants objected on the grounds they were "incompetent, irrelevant and immaterial to the issues of the case, and lacking in foundation."

■ Despite plaintiff's argument to the contrary such objections were sufficiently specific to raise an issue on appeal regarding relevancy and materiality. See State v. Clay, 213 N.W.2d at 477.

Furthermore, we have held the determination as to relevancy and materiality of evidence rests largely in the trial court's sound discretion. See State v. Clark, 187 N.W.2d 717, 720 (Iowa 1971). See generally 1 Wigmore on Evidence, § 29 (3d ed. 1940).

And as to admissibility in evidence of warranty related mass media product advertisements see generally Code § 554.-2313; Hawkins Construction Co. v. Matthews Co., Inc., 190 Neb. 546, 209 N.W.2d 643, 654 (1973); Lang v. General Motors Corporation, 136 N.W.2d 805, 809–810 (N. D.1965); Inglis v. American Motors Corp., 3 Ohio St.2d 132, 209 N.E.2d 583, 586–587 (1965); Nordstrom on Sales, § 68 at 207–212 (1970); 67 Am.Jur.2d, Sales, §§ 436–440; 29 Am.Jur.2d, Evidence, § 886;

Annot., 75 A.L.R.2d 112, 128–135. See also State Farm, etc., Ins. Co. v. Anderson-Weber, 252 Iowa 1289, 1297–1301, 110 N.W.2d 449 (1961). But as to "puffing" or "dealer's talk", see Nordstrom on Sales, § 64 at 199–202; 67 Am.Jur.2d, Sales, § 444.

■ In overruling defendants' objections to the controverted exhibits trial judge observed: "[T]he witness has tied in these ads in with the same automobile that he did purchase." We find no cause to now hold admission in evidence of the questioned magazine ads constituted an abuse of discretion.

V. As previously disclosed, defendants further maintain trial judge erroneously held the evidence created an issue as to an implied warranty of fitness for a particular purpose.

This court had occasion to consider the matter of implied warranties in Madison Silos, Division of Martin Marietta Corporation v. Wassom, 215 N.W.2d 494 (Iowa, opinion filed February 20, 1974), and there said:

"Section 554.2314 provides, in part:

" '1. Unless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'

"And § 554.2315 states:

" 'Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.'

"Then, regarding these two warranties this is, in material part, the Uniform Commercial Code Comment to § 2–315, 35 Iowa Code Annotated, at 333:

" '2. A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.'

"To the same effect is our holding in Peters v. Lyons, 168 N.W.2d 759, 763 (Iowa 1969).

"It is also understood both of the aforesaid warranties may be invoked and apply in the same case. See 1 Anderson, Uniform Commercial Code, § 2–314:60.

"Explanatively, id., § 2–315:6 states:

" 'Because of their distinctive characteristics the implied warranties of merchantability and of fitness for a particular purpose are not mutually exclusive so that the fact that one exists does not exclude the other. There may, however, be a factual inconsistency between the content of the two warranties in a given case. If this is so, there is a question of fact as to what was to be the seller's obligation, and any doubt is resolved in favor of the warranty of fitness for a particular purpose, unless the buyer furnished specifications to the seller.

" 'Ordinarily, however, no such question arises for when the seller is a merchant and the facts so warrant there may be both an implied warranty of merchantability by the merchant seller and a warranty of fitness for a particular purpose. And in any case it is unnecessary to determine whether a seller is liable for breach of a warranty for a particular purpose when there is a breach of warranty of merchantability arising under UCC § 2–314.' "

Additionally, as stated in 1 Anderson on Uniform Commercial Code, § 2–315:14 (2d ed. 1970):

"A particular purpose * * * is a use to which the goods are not ordinarily

put. The Official Code Comment makes the distinction between the ordinary use of shoes and a buyer's intention to use shoes for mountain climbing as illustrating a particular purpose of the buyer; however, it would seem that when shoes are sold as mountain climbing shoes their use for that purpose is not a use for a particular purpose.

"The concept of 'particular purpose' acquires more meaning when it is contrasted with the concept of 'ordinary purpose for which such goods are used', as that clause is used in connection with the implied warranty of merchantability."

■ Without question an implied warranty of merchantability, and of fitness for a particular purpose, may attend the sale of a motor vehicle. See 77 C.J.S. Sales § 330(e)(1) at 1198–1200. See also Henningsen v. Bloomfield Motors, Inc., 161 A. 2d at 76–84; 67 Am.Jur.2d, Sales, §§ 463– 472; 77 C.J.S. Sales §§ 325, 327; Annot., 99 A.L.R.2d 1419.

■ In the same vein, an express warranty and implied warranty of merchantable quality may fasten upon any such transaction. See State Farm, etc., Ins. Co. v. Anderson-Weber, *supra.*

■ It still remains, however, warranty of fitness for a particular purpose rests on what the seller has reason to know at time of sale and not thereafter. See Nordstrom on Sales, § 78 at 243; 67 Am.Jur.2d, Sales, § 468.

It is also understood all warranties, when questioned, require a close look at the bargain related facts, and claimed warranties of fitness require even closer scrutiny. See Nordstrom on Sales, *supra* at 245.

We therefore turn again to the factual situation now before us. It reveals, in relevant part, Jacobson purchased a Chevelle Super Sport 396. This is an automobile, albeit a sports car, ordinarily used for transportation on the public highways.

And even though it be assumed Jacobson, at time of purchase, intended to use the Chevelle for occasional drag racing there is nothing in the record disclosing GM or Benson were aware thereof prior to or at time of the original sale. Moreover, there is no showing upon which to even speculatively assume Jacobson ever had or timely manifested any other particular purpose. Stated otherwise, if Jacobson had other than an ordinary usage purpose in mind at any time material hereto it was not the basis of the bargain, either in whole or in material part. See Nordstrom on Sales, § 68 at 207–212.

Turning now to the focal point of this litigation we further find there was no bargain basis particular purpose manifested with regard to the subsequent engine replacement transaction. As heretofore indicated Jacobson initially bought what is basically a personal transportation vehicle, i. e., a car for purpose of commuting. And the fact he may have intended to occasionally use his newly motorized automobile for drag racing did not put the replacement deal within the ambit of an implied warranty for a particular purpose. As aforesaid such was not the basis of the replacement bargain.

■ In light of the factual setting here presented it is to us apparent and we now hold no issue was created as to implied warranty of fitness for a particular purpose, either in connection with the original car purchase or the subsequent motor replacement. This creates another cause for reversal on both appeals.

VI. Should the issue as to Benson's alleged negligence have been submitted to the jury?

John Dodson, referred to as a GM expert, appeared as a defense witness. On cross-examination he stated, in essence, the parts used by Benson in effecting the motor change on Jacobson's car should not have been "put on".

Also, Donald Schiltz, service manager for the GM Buick and Chevrolet agency in

Estherville, appearing on plaintiff's behalf, testified to the effect Jacobson's Chevelle would not operate properly as modified by Benson.

■ The foregoing and other related testimony sufficed to create a fact issue regarding negligence on Benson's part as alleged. See generally Iowa R.Civ.P. 344(f)(10); Prosser on Torts, § 30 at 143 (4th ed. 1971); Restatement (Second) Torts, § 281 at 4. See also Hedges v. Conder, 166 N.W.2d 844, 855 (Iowa 1969).

■ VII. Benson also here urges it was entitled to a directed verdict because of Jacobson's contributory negligence. Our scrutiny of the record reveals such error, if any, was not preserved for appellate review.

Noticeably Benson did not move for a directed verdict on the ground now advanced. In fact the argument here voiced was first made a part of Benson's after-the-verdict motion for a new trial. It thus came too late for consideration on this appeal. See Iowa R.Civ.P. 244(i) and 243(b); cf. Miller v. Young, 168 N.W.2d 45, 49–51 (Iowa 1969); Siebert v. State Farm Mut. Ins. Co., 251 Iowa 1060, 1062–1064, 103 N.W.2d 757 (1960).

■ In any event, contributory negligence will not ordinarily be decided as a matter of law. See Iowa R.Civ.P. 344(f)(10); Meade v. Roller, 212 N.W.2d 426, 429 (Iowa 1973).

VIII. Finally, both defendants maintain no warranty related damage issue should have been submitted to the jury. In the same vein Benson contends no fact question was created regarding damages for negligence and those punitive in nature.

Under existing circumstances no useful purpose will be served by attempting to correlate the mass of testimony touching upon the matter of damages.

We are satisfied the controverted issues, *supra*, were properly submitted to the jury.

On the other hand the multiple verdicts submitted are confusing and leave much to be desired.

For such guidance as may be provided on retrial of this case we deem it appropriate to here note some pertinent standards.

In the matter of damages allowable to a retaining buyer for breach of warranty see generally Code §§ 554.2714(2), (3)–554.-2715; W & W Livestock Enterprises, Inc. v. Dennler, 179 N.W.2d 484, 489–490 (Iowa 1970); Peters v. Lyons, 168 N.W.2d 759, 765–766 (Iowa 1969); Davis-Pickett Chevrolet, Inc. v. Collier, 106 Ga.App. 660, 127 S.E.2d 923, 925 (1962); 3 Bender's Uniform Commercial Code Service, §§ 14.-04(2)(b), 14.07(2) (1973); 2 Frumer-Friedman on Products Liability, § 16.01(2) (1973); Nordstrom on Sales, §§ 150–153 at 457–472; Annots., 17 A.L.R.3d 1010, 1117–1122, 99 A.L.R.2d at 1440–1444. See also Northrup v. Miles Homes, Inc. of Iowa, 204 N.W.2d 850, 856–857 (Iowa 1973); Johnson v. Scott, 258 Iowa 1267, 1270–1271, 142 N.W.2d 460 (1966); In re Estate of Holta, 246 Iowa 527, 531, 68 N.W.2d 314 (1955); 19 Drake L.Rev. 245, 254–255 (1970); 32 C.J.S. Evidence § 546(123), (126).

And with reference to damages in negligence see generally Harlan v. Passot, 260 Iowa 501, 506–507, 150 N.W.2d 87 (1967); 22 Am.Jur.2d, Damages, §§ 145–155; 25A C.J.S. Damages § 157.

Then in the area of exemplary damages attendant upon (1) breach of warranty, see Nordstrom on Sales, § 155 at 474–476, and (2) in tort, see Hagenson v. United Telephone Company of Iowa, 209 N.W.2d 76, 82 (Iowa 1973); Northrup v. Miles Homes, Inc. of Iowa, 204 N.W.2d at 859; Holden v. Construction Machinery Company, 202 N.W.2d 348, 359 (Iowa 1972); 22 Am.Jur.2d, Damages, § 252; 25A C.J.S. Damages § 159.

■ It is to be understood, however, punitive damages in either of the above fields must bear a reasonable relationship

to actual damages allowed. See Claude v. Weaver Construction Co., 261 Iowa at 1232, 158 N.W.2d at 145.

Costs on this appeal are taxed one-third to plaintiff and one-third to each defendant.

Reversed and remanded for a new trial.