WEST LIBERTY TELEPHONE COM-
PANY d/b/a Liberty Communica-
tions, Plaintiff,

v.

COPPERCOM, INC. and CopperCom
Acquisition Corporation,
Defendants.

No. 3:08–cv–00105–JAJ–TJS.

United States District Court,
S.D. Iowa,
Davenport Division.

Sept. 8, 2009.

Jeffrey D. Ewoldt, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiff.

Steven J. Havercamp, Stanley Lande & Hunter, Davenport, IA, Mark J. Altschul, McDermott Will & Emery, Chicago, IL, for Defendants.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the Court pursuant to Defendant CopperCom Acquisition Corporation's ("CCAC") Motion for Summary Judgment (Dkt. No. 6) and Defendant CopperCom, Incorporation's ("CopperCom") Motion for Summary Judgment (Dkt. No. 7). Plaintiff West Liberty Telephone Company d/b/a Liberty Communications ("Liberty") resisted the motion on October 17, 2008 (Dkt. No. 12). Both CCAC and CopperCom filed reply briefs on November 3, 2008 (Dkt. Nos. 16 & 17). For the reasons set forth below, the Court grants summary judgment for CopperCom on Counts One and Five. The Court denies summary judgment for CopperCom on Counts Two through Four. The Court denies summary judgment to CCAC on all counts.

### A. SUMMARY OF THE ARGUMENTS

In November 2005, Liberty entered into a contract with Phonetics, Incorporation ("Phonetics") for telecommunications equipment and service. In March 2006, CCAC acquired Phonetics. This action relates to whether CCAC and CopperCom assumed the obligations that Phonetics owed to Liberty. Liberty asserts five contract-based causes of action claims against CCAC and CopperCom: (1) breach of contract; (2) breach of contract under the Uniform Commercial Code; (3) breach of express warranty; (4) breach of implied warranty; and (5) breach of good faith and fair dealing. Defendant CCAC argues that it is entitled to summary judgment because it did not assume the disputed liabilities or obligations. Defendant CopperCom asserts that it is entitled to summary judgment because it was not a party to the acquisition contract between CCAC and Phonetics. Because an underlying contract is an element of each of Plaintiff's causes of action, CopperCom contends that the court should grant summary judgment on Counts One through Five.

Liberty responds that the Phonetics acquisition contract is ambiguous and there are genuine issues of material fact regarding the contract's interpretation, thereby making summary judgment inappropriate as against both Defendants. Alternatively, Liberty argues that even if the Defendants did not explicitly assume any obligations, then Defendants, by their words and actions, have implicitly assumed Phonetics' contractual obligations.

### B. STATEMENT OF MATERIAL FACTS [1]

#### 1. Material Facts Related to the Phonetics/CCAC Contract

Phonetics is a Kansas-based company

---

1. The facts in this section are either undisputed by the parties or, if disputed in good faith, taken in a light most favorable to Liberty as the nonmoving party.

that develops and markets telecommunications software known as the "Switchmaxx" and "Voicemaxx" systems. (Def. App. 000020.) On November 17, 2005, Liberty, an Iowa telecommunications company, entered into a license agreement with Phonetics for telecommunications equipment and service. (Pl. App. 1.) As part of this agreement, Phonetics agreed to install and provide service for the Switchmaxx system.

The parties disagree as to when Phonetics began installation of the system. Liberty contends that installation began in December 2005 (Pl. App. 2), but CCAC and CopperCom assert that they lack adequate information to determine the starting date. (CCAC/CopperCom Resp. 1, Nov. 3, 2008.) There is similar disagreement about the extent of the installation, as the project was delayed and behind schedule. Liberty manager, Jerry Melick, states that "[n]umerous deadlines in the timeline for installation and implementation of the Switchmaxx system were missed, and the project experienced significant delays." (Pl. App. 2.)

In late March 2006, CCAC acquired Phonetics. As part of the acquisition, CCAC and Phonetics entered into a Contribution and Transfer Agreement ("Transfer Agreement") which outlined assets, properties, rights, claims, liabilities and obligations of the parties. Pursuant to the agreement, Phonetics transferred and assigned "any rights under the contracts set forth on *Schedule 1.1(g)* ("*Assumed Contracts*")[.]" (Def. App. 000022.) The majority of the designated Assumed Contracts in Schedule 1.1(g) were license agreements with other customers, with the Liberty/Phonetics contract included. (Def. App. 000061.)

The Transfer Agreement was clear that CCAC only assumed certain designated liabilities and obligations. The Transfer Agreement states,

1.2 *Assumed Liabilities and Obligations.* At Closing, Buyer [CCAC] shall only assume the following liabilities (the "*Assumed Liabilities*"):

. . .

(b) liabilities and obligations of Seller [Phonetics] to be performed after the Closing Date with respect to the Assumed Contracts, other than liabilities and obligations resulting from a breach or default of Seller [Phonetics] under any Assumed Contract occurring on or before Closing, to the extent reflected on the Closing Date Balance Sheet.

(Def. App. 000022.) Conversely, the contract also states that Buyer is not liable for those contracts not assumed. (Def. App. 000022.) Correspondingly, the following clause then expressly excludes some liabilities:

1.3 *Excluded Liabilities and Obligations.* Buyer [CCAC] shall not be the successor to Seller [Phonetics], and except as expressly set forth in *Section 1.2* herein, Buyer shall not assume and shall not be liable or responsible for

. . .

(b) liabilities and obligations under any contract, agreement or instrument of Seller or the Business to the extent not explicitly assumed herein, (c) liabilities and obligations with respect to any dispute, action, suit or proceeding against Seller [Phonetics] or arising in connection with the operation of the Business or the Purchased Assets prior to Closing. . . .

(Def. App. 000022.) The accompanying separate Assumption Agreement further indicates CCAC's assumed obligations and liabilities,

For good and valuable consideration . . . Buyer [CCAC] hereby assumes and agrees to pay, perform and discharge when due the Assumed Liabilities, including without limitation, all obligations

of Seller arising from or required to be performed after the Closing under the Contracts listed on *Schedule A* hereof. Buyer is not hereby assuming and shall not have any liability or obligation with respect to any Excluded Liabilities. (Def. App. 000341.) Schedule A cross-references and integrates Schedule 1.1(g) of the Transfer Agreement when referring to Assumed Liabilities of the acquisition.

### 2. *Material Facts Related to Liberty's Claim of Implicit Assumption*

Following the Phonetics acquisition in March 2006, Liberty claims there were several communications between it and CCAC personnel relating to installing Switchmaxx. (Pl. App. 2–3.) CCAC denies that most of those communications occurred. (Def.'s Resp. Pl.'s St. Mat. Facts 2–5.) According to Liberty, on or about April 10, 2006, Switchmaxx project managers, Norton Jackson and Bob Pickens, called Melick to discuss the ramifications of the acquisition. Pickens and Jackson assured Melick that the Switchmaxx division would remain in Wichita, Kansas, and the personnel would not change. (PL App. 2.) They also assured Melick that the acquisition would provide more resources, ostensibly enhancing product performance, and allow Switchmaxx to be bundled with future CCAC's products. (PL App. 2.)

Greg Alia, CCAC's Vice President for Operations and Customer Support, followed the phone call with a letter dated May 25, 2006. (Pl. App. 6.) The letter reiterated the details of the acquisition, outlined "the integration of service and support" of the Switchmaxx product into CCAC's product line, and also advised Liberty of a new technical support center for its Switchmaxx product. (Pl. App. 6.) It also included contact information for the "CopperCom Operations team who are responsible for Installation, Professional Services (Turn–Up) and Technical Support." (Pl. App. 6.) CCAC and CopperCom ac-

knowledge the existence of the letter but deny that it creates liability for any breach. (Def.'s Resp. Pl.'s St. Undisp. Mat. Facts 3–4.)

Liberty asserts that over the next few months, CCAC attempted to finish installation of Switchmaxx but never achieved "full[ ] functionality in the manner specified in the original agreement." (Pl. App. 3.) CCAC denies this. (Def.'s Resp. Pl.'s St. Undisp. Mat. Facts 2–4.) On December 20, 2007, Liberty received a letter from CCAC President and CEO Julian Thomas, announcing the discontinuance of the Switchmaxx product. (PL App. 7.) Regarding technical support, the letter stated, "CopperCom will continue to support software products for the duration of your existing software warranty and support arrangement with CopperCom." (PL App. 7.) While specifying a final order date for additional or expansion plug-in hardware components, Thomas stated that, "[h]ardware repair and return services will be available for the duration of your existing warranty arrangement with CopperCom." (PL App. 7.) Accompanying the letter was a document titled "Key Questions," which stated that "CopperCom plans to meets its warranty and support obligations." (PL App. 8.) CCAC and CopperCom admit that this document speaks for itself, but deny that it obligates them in any way. (Def.'s Resp. Pl.'s St. Undisp. Mat. Facts 5.)

Melick responded to the letter, requesting a refund and damages, among other things. On May 16, 2008, Thomas sent Melick a response. (Pl. App. 10.) Thomas stated, "We are in a position to continue to completion the installation, certification and commissioning of the SMAXX system, with Liberty's assistance as required by contract." (Pl. App. 10.) Thomas suggested that the two "reset the clock" and come up with a new project plan and time line.

(Pl. App. 10.) The letter referenced "the contract" on several occasions. (Pl. App. 10.) The Court notes that the Dec. 10, 2007 letter from Thomas was on CopperCom letterhead, whereas Thomas signed the May 16, 2008 letter on behalf of CCAC.

### 3. Material Facts Related to CopperCom's Relationship to CCAC and Phonetics

Liberty has filed suit against CCAC as well as CopperCom. CopperCom contends that it is entitled to summary judgment because it was not a party to the Transfer Agreement.[2] Because it was not a party to the contract, CopperCom did not assume any obligations or liabilities of the Phonetics/Liberty License Agreement.

CopperCom is listed as a party to the contract in the preamble, as the agreement states that it is entered into "by and among CopperCom, Inc., a Delaware corporation ("CopperCom"), CopperCom Acquisition Corp., a Delaware corporation ("Buyer"), Phonetics LC, a Kansas limited liability company ("Seller")." (Deft. App. 000020.) CopperCom states that the extent of its involvement with the Transfer Agreement was only to transfer ownership of the entirety of its assets to CCAC.[3] The Agreement reads, "6.1 **CopperCom Assets.** . . . at the time of Closing, Buyer [CCAC] will own all right, title and interest in, to or under all of the assets . . . of CopperCom [CopperCom] . . . including properties, rights, interests of any kind and claims free and clear of all Liens. . . ." (Def. App. 000043.)

CopperCom also appears in the Transfer Agreement in Section 3.5, in reference to CopperCom's duty to "use its best efforts to obtain any and all such consents, approvals and novations [of contracts] before and after Closing." (Def. App. 000041.) In the event CopperCom contracts to CCAC were nonassignable, CopperCom committed itself to either working with the other party to find a "reasonable" accommodation or to act as CCAC's agent to complete contracts. (Def. App. 000041.)

Thus, CopperCom is never referred to in the Agreement as a buyer or acquirer of Phonetics Assets. Rather, CopperCom was integrated into the contract as a party singularly to transfer CopperCom assets to CCAC.

### C. CONCLUSIONS OF LAW

#### 1. Summary Judgment Standard

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *HDC Medical Inc. v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir.2007) (citation omitted); *see also Kountze ex rel. Hitchcock Foundation v. Gaines*, 536 F.3d 813, 817 (8th Cir.2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."). Summary judgment is appropriate when the evidence is so one-sided that "there exists only one

---

**2.** Liberty did not respond, affirming or denying, any of CopperCom's alleged facts. The court therefore accepts them as undisputed facts.

**3.** It appears that either concurrently or through the Transfer Agreement, CopperCom became the parent company of CCAC, as the Tax Sharing Agreement (executed on the same day as the Contribution and Transfer Agreement or March 23, 2006) stipulated a sharing of tax liability following the Phonetics acquisition and directly referenced CopperCom as "Parent" and CCAC as "Subsidiary." (Def. App. 000507.)

conclusion." *Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (citation omitted).

Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists "if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Great Plains Real Estate Development, L.L.C. v. Union Central Life Ins. et al.,* 536 F.3d 939, 944 (8th Cir.2008) (citation omitted). A genuine issue of fact will be material if it "might affect the outcome of the suit under the governing law." *Saffels v. Rice,* 40 F.3d 1546, 1550 (8th Cir.1994) (citation omitted). The nonmovant is then "entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation." *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1110 (8th Cir.2001) (citation omitted). Although the non-movant is not required to submit "direct proof that genuine issues of fact exist for trial, the facts and circumstances that she [or he] relies 'upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion.' " *Taylor v. White,* 321 F.3d 710, 715 (8th Cir.2003) (citation omitted). A "scintilla" of evidence supporting the movant's position is insufficient because "there must be evidence on which the jury could reasonably find for the plaintiff." *Sprenger,* 253 F.3d at 1110.

### 2. CopperCom's Liability

CopperCom seeks summary judgment because it claims it is not a party to the Transfer Agreement and has not assumed Phonetics' obligations and liabilities. It denies liability for any of Liberty's contract-based claims.

The Transfer Agreement lists the parties to the agreement. It reads,

This agreement is made and entered into this 23rd day of March, 2006, by and among *CopperCom, Inc.,* a Delaware corporation ("CopperCom"), CopperCom Acquisition Corp., a Delaware corporation ("Buyer"), Phonetics LC, a Kansas limited liability company ("Seller").

(Deft. App. 000020) (emphasis added). The contract indicates that CopperCom was a party to the Transfer Agreement. Looking further into the contract, however, the Court finds that nearly all clauses establish an agreement between CCAC ("Buyer") and Phonetics ("Seller"). The contract shows that CopperCom did not acquire Phonetics, nor did it assume the Phonetics/Liberty License Agreement. For example, the contract states, "At Closing, *Buyer* shall only assume the following liabilities," (Def. App. 000022) (emphasis added), "*Buyer* hereby assumes and agrees to pay, perform and discharge when due the Assumed Liabilities," (Def. App. 000341) (emphasis added), and "*Seller* hereby sells, transfers, assigns and delivers to *Buyer* all right, title and interest in, to or under all of Seller's assets, properties, rights, interests of any kind." (Def. App. 000021) (emphasis added). The Court does not find any place in the contract where CopperCom, as opposed to CCAC, binds itself to any of Phonetics' obligations or liabilities. In fact, CopperCom appears in only two sections of the contract.

Where the contract does mention CopperCom, it states that CCAC will acquire all assets of CopperCom. Section 6.1 reads, "[A]t the time of Closing, Buyer will own all right, title and interest in, to or under all of the assets … of CopperCom … including properties, rights, interests of any kind and claims free and clear of all Liens…." (Pl. App. 000043.) Additionally, section 3.5 reinforces CopperCom's commitment to assist in assignment and novation of its contracts to CCAC. (Def. App.

000041.) These sections in no way obligate or infer any liability of CopperCom to Phonetics.

Because there was no agreement between CopperCom and Phonetics, Liberty's claims must be examined in turn because an express contract or agreement is a necessary element to some, but not all, of Liberty's causes of action. Several of the causes of action can imply a contract based on conduct, representations, or generally have a more lenient standard for contract formation.

■ Count One alleges breach of contract under Iowa common law. In a breach of contract claim, the plaintiff must show,

> (1) [T]he existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Kern v. Palmer College of Chiropractic,* 757 N.W.2d 651, 657–58 (Iowa 2008) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998) (internal quotation marks omitted)). The contract at issue did not include any agreements or obligations flowing from or between Phonetics and CopperCom. Accordingly, Liberty cannot show that CopperCom breached the contract, and subsequently, that it suffered damages as a result of CopperCom's alleged breach. Accordingly, the Court grants summary judgment to CopperCom on this count.

■ Plaintiff's claim on Count Five fails for similar reasons. To succeed on a breach of covenant of good faith and fair dealing claim, the parties must be engaged in a contract, either express or oral. *See Kopple v. Schick Farms, Ltd.,* 447 F.Supp.2d 965, 981 (N.D.Iowa 2006). Yet a court will only recognize the existence of an oral contract where there is "sufficient evidence of its terms to ascertain the duties and conditions established." *Id.* at 980. "Under Iowa law, a covenant of good faith and fair dealing is [then] implied in every contract, imposing on each party to the contract a duty of good faith and fair dealing in the performance and enforcement of that contract." *Id.* at 981. A covenant of good faith and fair dealing "is breached when a party to a contract acts in a manner that is offensive to 'community standards of decency, fairness and reasonableness.'" *Id.* (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 34 (Iowa 1982)).

In *Kopple,* the court granted summary judgment to the defendant on a good faith and fair dealing claim after finding that no oral or written contract existed between the parties. *Id.* Similarly, here, while Phonetics and CopperCom were parties to the same contract, there was no agreement between the two parties that could satisfy the formation of an express contract. There was no oral contract. Even Liberty asserts that there was only one telephone conversation early on in the installation negotiations. (Pl. App. 2.) As opposed to formalizing any mutual understandings orally, the CopperCom/CCAC representatives can be characterized during that conversation only as having 'pitched' the Phonetics acquisition to Liberty. Furthermore, the subsequent letters CopperCom allegedly addressed to Liberty do not provide sufficient evidence to indicate any mutual agreement, such as an offer and acceptance, to form a contract was ever reached. (Pl. App. 2–4.) It is therefore proper to grant summary judgment to CopperCom on Count Five.

■ Count Two alleges breach of contract under the Uniform Commercial Code ("UCC"). The Court has concluded that CopperCom was not a party to the express

assumption of Phonetics' liabilities and correspondingly, there is no express contract for the sale of goods. However, contract formation requirements under the UCC are more lenient than common law standards, such that "[a] contract for [the] sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." IOWA CODE § 554.2204(1) (2001). It is not necessary to determine the precise moment of formation. § 554.2204(2). Furthermore, the parties' conduct "which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." § 554.2207(3). If a UCC contract arises by implication, then "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." § 554.2314(1). When a contract consists of mixed goods or services, the test for inclusion under the UCC is whether the "predominant factor, ... is rendition of service, with goods incidentally involved, or is [a] transaction of sale, with labor incidentally involved." *Bonebrake v. Cox*, 499 F.2d 951, 960 (Iowa 1974) (citing Iowa Code § 554.2102).

■ In this case, the Liberty/Phonetics Licensing Agreement falls within the UCC definition for the sale of goods, as hardware and software are the main objects of the Licensing Agreement. (Def. App. 000012.) Phonetics agreed to provide "a total complete system including software, support and appropriate hardware." (Def. App. 000013.) As part of the maintenance and support services, Phonetics agreed to replace defective hardware parts and provide the latest software enhancements. (Def. App. 000015.) Liberty alleges that correspondence and product installation reassurances on behalf of CopperCom from April 10, 2006 to December 20, 2007 establish a contract. (Pl. App. 5–

9; Pl.'s Br. 4–7.) Liberty alleges that CopperCom also continued to work on installation during that same time period. (PL App. 3.) Because genuine issues of material fact exist as to whether CopperCom's conduct and representations to Liberty following the Phonetics acquisition were sufficient to establish a contract, the Court denies summary judgment on Count Two.

■ Counts Three and Four also arise under the UCC. Count Three alleges a breach of express warranty and Count Four asserts a breach of implied warranty. *See* IOWA CODE § 554.2313 (2001); IOWA CODE § 554.2314 (2001). Under Iowa law, to breach an express warranty, the Seller must give either an "affirmation of fact or promise ... which relates to the goods," "a sample or model of the goods," or a "description of the goods which [was] made part of the basis of the bargain [that] creates an express warranty that the goods shall conform to the description." § 554.2313(1)(a)-(c). Sales representative statements to buyers can cross over into an express warranty, when it "induc[es] representation or affirmation of fact[s] given in such terms as to attain the status of a warranty." *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 151 N.W.2d 477, 484 (1967). Overall, express warranties must be "relative to what would normally pass in the trade without objection under the contract description." *Kolarik v. Cory Intern. Corp.*, 721 N.W.2d 159, 164 (Iowa 2006) (citations omitted).

■ CopperCom was not a party to the Contribution and Transfer Agreement, and is thus without liability for any representations made in accordance with the Liberty/Phonetics Licensing Agreement, under which a breach of express warranty would ordinarily arise. However, CopperCom's conduct and certain representations made *after* the completion of the Transfer

Agreement could form the basis of an express warranty. CopperCom's May 25, 2006, letter mainly outlines technical support services and reassures customers that response times to problems will remain a priority. (Pl. App. 6.) Furthermore, as relevant to Liberty, the letter states that if the customer is "currently in the turn-up or commissioning mode, you will be assigned a Project Manager." (Pl. App. 6.) The next letter dated December 20, 2007, approximately one and a half years later, provides more explicit assurances that service would not be interrupted despite Switchmaxx discontinuance. (Pl. App. 7.) CopperCom affirms that "[h]ardware repair and return services will be available for the duration of your existing warranty arrangement with CopperCom" and that "CopperCom will continue to support software products for the duration of your existing software warranty and support arrangement with CopperCom." (Pl. App. 7.) In the attached "Key Questions" document, CopperCom again emphasizes that it "plans to meet its warranty and support obligations." (Pl. App. 8.)

At the very least, the length of time between these letters suggest some intent to affirm and uphold existing contractual obligations. Whether or not these letters constitute either an affirmation of fact or promise to Liberty remains a genuine question of material fact. The letters also create confusion as to the degree of involvement CopperCom had with CCAC's business during this time period, and if CopperCom was, in fact, holding itself out as affirming the obligations CCAC assumed from the Liberty/Phonetics License Agreement. The Court accordingly denies summary judgment to CopperCom on Count Three.

Liberty's final claim in Count Four alleging breach of implied warranty also necessarily depends on whether or not there was an enforceable UCC contract.

A breach of implied warranty means that "the goods shall be merchantable [and] is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Iowa Code § 554.2314(1). Merchantable goods, as relevant to this case, must at least "pass without objection in the trade under the contract description; and ... [be] fit for the ordinary purposes for which such goods are used; ...." § 554.2314(2)(a), (c). "[C]ourse of dealing or usage of trade" may also create implied warranties. § 554.2314(3). Implied warranty of merchantability does not require the buyer to prove that the seller knew of any particular purpose or use for the products, or that the "buyer in fact relied on seller's skill and judgment." *Van Wyk v. Norden Laboratories, Inc.*, 345 N.W.2d 81, 87 (Iowa 1984). Rather, it is premised on the expectation that goods will conform to a "purchaser's reasonable expectation" and will be "free of significant defects." *Id.* at 84. Defective products during a lease period can also create breach of an implied warranty of merchantability. *See Morris Plan Leasing Co. v. Bingham Feed & Grain Co.*, 259 Iowa 404, 143 N.W.2d 404, 418 (1966) (breach of implied warranty where mechanical defects and failure of equipment during lease period caused equipment to be unfit and unsuitable for defendant's known intended use). In order to then recover for a breach of implied warranty, the buyer has the burden of proving the merchant sold the goods, the goods were not merchantable when sold, the buyer's property was injured or damaged, "the goods caused damage proximately and in fact, and that seller was given notice of damage." *Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 638 (Iowa 1988).

There is sufficient evidence in the record to suggest that the Voicemaxx software was never fully operational and Liberty notified CopperCom on March 17, 2008

that it was seeking "a full refund, damages, retention of the product and access to the source code." (Pl. App. 10.) If the functionality of Voicemaxx did not conform to reasonable expectations and there were significant defects in performance, then Voicemaxx may not have been a merchantable good. However, ambiguities abound concerning CopperCom's role following the March 2006 Phonetics acquisition and the extent of damage to Liberty's business. The continued installation and work on the Voicemaxx system during the summer of 2006 (Pl. App. 3), can create a claim for breach of warranty of merchantability. As discussed previously, there is a genuine issue of material fact as to whether CopperCom's conduct and representations to Liberty created an enforceable UCC contract. Furthermore, it is possible that CopperCom's course of dealing with Liberty and subsequent failure to remedy substantial defects, resulted in a product that could not be used for its intended use and would be unacceptable in the software trade. Accordingly, the Court denies summary judgment to CopperCom on Count Four.

### 3. Whether CCAC Assumed Phonetics' Obligations and Liabilities

CCAC argues that it did not assume Phonetics' obligations and liabilities under the Transfer Agreement prior to the closing date. CCAC contends that it is only liable for liabilities after March 23, 2006. The general rule of corporate non-successor liability is that "a corporation that purchases the assets of another corporation assumes no liability for the transferring corporation's debts and liabilities." *In re Lang*, 398 B.R. 1, 4 (Bankr.N.D.Iowa 2008). There are four exceptions to this rule, one of which is when a "buyer agrees to be held liable" through an express or implicit agreement. *Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200–01 (Iowa 1996). Here, CCAC argues that they have not agreed to assume liability, while Liberty asserts that they assumed liability through the express terms of the Transfer Agreement. Alternatively, Liberty argues that CCAC implicitly assumed liability through the words and actions of CCAC agents, indicating that they would complete performance of the contract.

Section 1.2 of the Transfer Agreement discusses the terms and obligations of the parties, stating that CCAC will only assume certain liabilities outlined in the contract. It states that CCAC will assume the "liabilities and obligations of Seller to be performed after the Closing Date with respect to the Assumed Contracts, other than liabilities and obligations resulting from a breach or default of Seller under any Assumed Contract occurring on or before Closing to the extent reflected on the Closing Date Balance Sheet." (Def. App. 000022.) The Assumption Agreement, incorporated by reference into the Transfer Agreement, includes similar language: "Buyer hereby assumes and agrees to pay, perform and discharge when due the Assumed Liabilities, including without limitations, all obligations of Seller arising or required to be performed after the Closing under the Contracts listed on *Schedule A* hereof." (Def. App. 000341) (emphasis added). Schedule A includes the Phonetics/Liberty License Agreement. (Def. App. 000344.)

Liberty argues that the terms of the Transfer Agreement are ambiguous and therefore, extrinsic evidence should be allowed to show the meaning of contract terms. Liberty contends that evaluation of extrinsic evidence is left for the trier of fact and is inappropriate for summary judgment. (Pl.'s Resistance 8.) CCAC argues that the terms are clear and unambiguous and should be interpreted as a matter of law. (CCAC Reply 3–4.) CCAC contends that the agreement states that CCAC is not responsible for any of

Phonetics' actions prior to March 23, 2006, and this would seemingly include Phonetics' failure to complete installation of the Switchmaxx system. (CCAC Reply 4.)

 Under Iowa law, the interpretation of a contract is a matter of law unless it is ambiguous. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). If the contract is ambiguous, the trier of fact must evaluate extrinsic evidence to determine the meaning of the contract. *Id.*; *see also* RESTATEMENT 2D OF CONTRACTS § 212(2) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."). However, even if ambiguous, the court may grant summary judgment if "the evidence is so clear that no reasonable person would determine the issue in any way but one." *Fausel v. J.R.J. Enters.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting RESTATEMENT 2D OF CONTRACTS § 212(e)) (internal quotations marks omitted).

 Here, the parties initially dispute whether the contract is ambiguous. "A term is ambiguous if after all pertinent rules of interpretation have been considered, a genuine uncertainty exists concerning which of two reasonable interpretation is proper." *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001) (internal citations and quotations omitted). Mere disagreement about the meaning does not make a term ambiguous. *Rick v. Sprague*, 706 N.W.2d 717, 723 (Iowa 2005). All circumstances surrounding the formation of the contract must be considered when discerning meaning. *Pillsbury*, 752 N.W.2d at 436. But ultimately, the words of a contract remain the most significant indication of the parties' intent and plain meaning controls. *Id.*

CCAC contends that Phonetics breached the contract prior to their assumption of the contract on the closing date, March 23, 2006. (CCAC Reply 4.) CCAC does not dispute that it assumed the Phonetics/Liberty License Agreement pursuant to the Transfer Agreement, but does argue that it did not assume liability resulting from Phonetics' failure to perform obligations prior to the closing date. "[W]hile CCAC may have assumed Phonetics's post-March 23, 2006 liabilities and obligations under the License Agreement, CCAC did not assume Phonetics's prior obligations and liabilities or obligations and liabilities resulting from Phonetics's breach or default." (CCAC Br. 5.)

 The language of the Agreement unambiguously shows that CCAC is not responsible if Phonetics breached the contract prior to March 23, 2006. "Buyer [CCAC] shall only assume the following liabilities," which include "liabilities and obligations of Seller to be performed after the Closing Date ... *other than liabilities and obligations resulting from a breach or default of Seller ...*" (Def. App. 000022) (emphasis added). Giving "effect to the language of the contract in accordance with its plain and ordinary meaning," the Court finds that this language unambiguously means that CCAC is not liable for a breach caused by Phonetics before the closing date, March 23, 2006. *In re Estate of Woodroffe*, 742 N.W.2d 94, 106 (Iowa 2007).

While the Transfer Agreement is clear that CCAC is not responsible if Phonetics breached the License Agreement prior to March 23, 2006, genuine issues of material fact remain as to whether Phonetics breached the Agreement. Liberty asserts that Phonetics began performance of the contract in December 2005 and responsibility for the completion of the contract transferred to CCAC on March 23, 2006. CCAC disagrees; it denies entirely that Phonetics began performance. It argues

that Phonetics breached the License Agreement between the time the Agreement was formed and the Closing Date of the CCAC acquisition. "CCAC cannot be liable under the Transfer Agreement for actions, or inaction, on the part of Phonetics occurring after the November 17, 2005 commencement of the License Agreement but prior to the March 23, 2006 closing date." (CCAC Br. at 6.) Liberty responds that when CCAC assumed the Liberty/Phonetics License Agreement, they assumed all unfulfilled obligations and liabilities. (Pl.'s Resistance 9–10.)

Section 1.2 of the Assumption Agreement states that CCAC will assume "liabilities and obligations of Seller to be performed after the Closing Date with respect to the Assumed Contracts ... to the extent reflected on the *Closing Date Balance Sheet.*" (Def. App. 000022.) A plain reading of the phrase "to the extent reflected on the Closing Date Balance Sheet" means that CCAC is responsible for the obligations and liabilities enumerated on the balance sheet. The plain language does not absolve responsibility for anything that happened before March 23, 2006. Rather, Section 1.2 means that liability, as reflected on the closing balance sheet, shifts from Phonetics to CCAC on the closing date.

▮ The Closing Balance Sheet was not included in the record. Therefore, it is impossible to determine how much, if any, of the contract had been performed at the time of closing or how much of the contract CCAC assumed.[4] The record does include a preliminary balance sheet dated November 30, 2005. On that balance sheet, the Liberty/Phonetics License Agreement is listed as an "outstanding

contract." (Pl. App. 000070–000073.) Under the "Percent Complete Schedule," the contract is listed as 0.00 percent complete and Liberty having paid $18,540. (Def. App. 000073.) Should the Closing Balance Sheet reflect the same, CCAC would be responsible for completing 100% of the License Agreement. However, the November 30, 2005 balance sheet was created two weeks after Phonetics and Liberty entered into the License Agreement. It is plausible that portions of the contract may have been completed between November 30, 2005, and March 23, 2006. But without the Closing Balance Sheet, this is only speculation. Genuine issues of material fact remain as to whether Phonetics began performance and how much liability shifted from Phonetics to CCAC on the closing date pursuant to the missing Closing Balance Sheet. Because the Court denies summary judgment on the theory that CCAC expressly assumed liability, it need not address implicit assumption of liability.

Upon the foregoing,

**IT IS ORDERED**

Defendant CCAC's Motion for Summary Judgment (Dkt. No. 6) on Counts One through Five is DENIED.

Defendant CopperCom's Motion for Summary Judgment (Dkt. No. 7) on Counts One and Five is GRANTED.

Defendant CopperCom's Motion for Summary Judgment (Dkt. No. 7) on Counts Two through Four is DENIED.

---

4. According to the Transfer Agreement, CCAC was to prepare and deliver a Closing Balance Sheet within 60 days of the closing date. (Transfer Agreement ¶ 1.9, Def. App. 000025.) Liberty refers to Schedule 1.8 (Def. App. 000070–000073) as the "Closing Balance Sheet" but Paragraph 1.9 makes clear that this balance sheet, dated November 30, 2005, was not intended to be the final reflection of liability for the assumed contracts.