Vernon VAN WYK and Kenneth Smith,
Partners; Hauser Farms, Inc.; and
Porter Farms, Inc., Appellees,

v.

NORDEN LABORATORIES,
INC., Appellant.

No. 68922.

Supreme Court of Iowa.

Feb. 15, 1984.

H. Richard Smith and Wade R. Hauser, III of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, for appellant.

Richard K. Updegraff and Jill Thompson Hansen of Brown, Winick, Graves, Donnelly & Baskerville, Des Moines, for appellees.

Considered by McGIVERIN, P.J., and LARSON, SCHULTZ, CARTER, and WOLLE, JJ.

LARSON, Justice.

A large number of cattle owned by the plaintiffs became sick shortly after injection of a vaccine produced by the defendant Norden Laboratories, Inc. and this suit followed. While several theories of liability were asserted by the plaintiffs, the court submitted only one: the implied warranty of fitness for a particular purpose (Iowa Code section 554.2315). The defendant appeals from a judgment for the plaintiffs, arguing that the court erred in submitting this theory under the facts of the case. It contends the implied warranty of fitness did not fit, so to speak. The plaintiffs cross-appeal, complaining that it was error to exclude certain expert evidence and to refuse submission of their alternative theories of strict liability and implied warranty of merchantability. We reverse on both appeals and remand.

In the fall of 1978, three groups of the plaintiffs' cattle, totaling about 750, were treated with a live-virus vaccine, manufactured by the defendant and called Resbo-3, serial 54. Some of the cattle had been raised by the plaintiffs, and some had been shipped in. Some were treated on the farm and some in a sale barn. The cattle were given other treatments such as worming, castration, and dehorning, simultaneously with the series 54 vaccine, but not all of them received the same combination of treatments. Yet, the incidence of bovine viral diarrhea (BVD) appeared, to a large extent, in all three herds. (BVD is one of the illnesses which the series 54 vaccine was designed to prevent.) Within a week of their injection, most of the cattle were sick. Almost 50 died. Plaintiffs' veterinarian witnesses testified that the sickness had been caused by the vaccine. They testified that before and after this incident they had used serial 54 vaccine without similar problems and that while it is reasonable to expect a few cattle to have an adverse reaction, they had never seen anything like the extent of sickness in this case. In view of this common denominator among the separate herds of cattle—their treatment with series 54 vaccine—a strong circumstantial case is claimed by the plaintiffs that the illness was in fact caused, or at least exacerbated by, the vaccine. No direct evidence of a defect was produced, however.

## I. *The Implied Warranty of Fitness.*

The only theory of liability submitted by the court was breach of implied warranty of fitness for a particular purpose, Iowa Code § 554.2315 (Uniform Commercial Code § 2–315). That section provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

The implied warranty of fitness for a particular purpose under section 554.2315 is perhaps better understood when viewed

with the implied warranty of merchantability, or fitness for ordinary purposes. Iowa Code section 554.2314 sets out the latter:

(1) Unless excluded or modified (section 554.2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) *are fit for the ordinary purposes for which such goods are used;* and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on container or label if any.

(3) Unless excluded or modified (section 554.2316) other implied warranties may arise from course of dealing or usage of trade.

(Emphasis added.)

The official comment to the Uniform Commercial Code illustrates the difference between "ordinary" and "particular" purposes under the respective warranties:

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

U.C.C. § 2–315, Comment 2, 1 U.L.A. 483 (1976).

██ The warranty of merchantability, Iowa Code § 554.2314, is based on a purchaser's reasonable expectation that goods purchased from a "merchant with respect to goods of that kind" will be free of significant defects and will perform in the way goods of that kind should perform. It presupposes no special relationship of trust or reliance between the seller and buyer. In contrast, the warranty of fitness for a particular purpose, Iowa Code § 554.2315, is based on a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer. Thus, any recovery under warranty for a specific purpose is predicated on a showing that (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; and (3) the buyer in fact relied on the seller's skill or judgment to furnish suitable goods. *Semler v. Knowling,* 325 N.W.2d 395, 399 (Iowa 1982); J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 9–9 at 358 (2d Ed.1980). *See also Farm Bureau Mutual Insurance Co. v. Sandbulte,* 302 N.W.2d 104, 111 (Iowa 1981).

██ The warranty of fitness under section 554.2315 is said to turn on the "bargain-related" facts as to what the seller had reason to know about the buyer's purpose for the goods and about his reliance on the seller's skill or judgment in selecting them. *Jacobson v. Benson Motors, Inc.,* 216 N.W.2d 396, 404 (Iowa 1974). In this case the vaccine was not purchased by the veterinarians to treat these particular cattle but to keep in stock for their general veterinary practice. The plaintiffs, as owners of the cattle, and the defendant, had no

direct dealing with regard to the vaccine. The decision as to what vaccine to use was made by the buyers' veterinarians, not by the defendant. There was no evidence that the seller had reason to know of any purpose for the plaintiffs' use of the vaccine, other than its ordinary use, or that the buyer was relying on the seller's skill and judgment in providing it. The implied warranty of fitness for a particular purpose would appear, therefore, to be inapplicable by its terms. *See* Iowa Code § 554.2315; *Semler v. Knowling*, 325 N.W.2d at 399; *Jacobson v. Benson Motors, Inc.*, 216 N.W.2d at 404.

The plaintiffs argue, however, that if the buyer's particular purpose is the same as its general use, a warranty of fitness arises, especially when the product has a specific and limited use. In that case, the other elements of the fitness warranty, i.e., the knowledge of the buyer's purpose, knowledge of the buyer's reliance, and the buyer's actual reliance, are apparently to be presumed. The plaintiffs cite only one case, *Tennessee Carolina Transportation Inc. v. Strick Corp.*, 283 N.C. 423, 196 S.E.2d 711 (1973), in support of this theory. That case involved the sale of truck trailers which proved to be faulty. There the court held that because the buyer's "specific use" was the same as the "general use" to which trailers are usually put, hauling cargo, the warranty of fitness would apply. It rejected the general rule that a "particular" use must be a use not normally expected to be made of the goods, a rule recognized by our cases, e.g., *Madison Silos v. Wassom*, 215 N.W.2d 494, 499–500 (Iowa 1974); *Peters v. Lyons*, 168 N.W.2d 759, 763 (Iowa 1969), and by the Uniform Commercial Code. *See* U.C.C. § 2–315, Comment 2, 1 U.L.A. 483 (1976).

Cases such as *Tennessee Carolina*, moreover, have been criticized as enlarging the fitness warranty beyond the intent of the drafters of the Uniform Commercial Code. *See* J. White and R. Summers, *supra*, § 9–9 at 357, n. 122.

In this case, written material furnished with the vaccine stated that "[f]or reducing the economic loss associated with these viruses, vaccination of healthy animals is recommended before or upon entering the feedlot or dairy herd. Vaccination of stressed animals should be delayed." Use of the vaccine on healthy, unstressed cattle, in accordance with these instructions, is the "ordinary" use for warranty purposes, according to the defendant, and the plaintiffs' evidence was aimed at showing a use in compliance with the instructions, in other words, an "ordinary" use. While there was contradicting evidence presented by the defendant that the cattle were stressed and perhaps not healthy at the time they were vaccinated, there is no claim by the plaintiffs that this deviation from ordinary use is itself a "particular" use. They merely claim that their use here is an ordinary use which we should consider as a particular use for warranty purposes. For the reasons to be discussed, we decline to do so.

Obviously, in some cases a buyer's particular purpose will be the same as the ordinary purpose for which a product is furnished. In that case, both types of implied warranty may arise. *See Jacobson v. Benson Motors, Inc.*, 216 N.W.2d 396, 404 (Iowa 1974) (sale of motor vehicle); *Madison Silos v. Wassom*, 215 N.W.2d 494, 499–500 (Iowa 1974) (stave silo); 1 R. Anderson, *Uniform Commercial Code*, § 2–314:60 (1970); Iowa Code § 554.2315, official comment 2. It is quite another matter, however, to impose an implied warranty of fitness solely on the basis of this identity of purpose. A particular purpose of the buyer is only one of the elements of that warranty; it still turns on what the seller had reason to know—both as to the buyer's particular purpose and as to the buyer's reliance on the seller's skill and judgment. *Jacobson*, 216 N.W.2d at 404. There are no bargain-related facts in this case to support a finding of these elements and we will not assume their existence merely on the basis of the limited-use nature of cattle vaccine. We will not assume, as the plaintiffs suggest, that the seller had reason to know of the buyers' particular purpose,

and their reliance on the skill and judgment of the seller, merely because cattle vaccine is only usable for one purpose. As the record shows in this case, the vaccine may still be used in different ways, some anticipated by the seller and some not. (The defendant claims it was used in a manner proscribed by the written material accompanying the vaccine.)

■ The plaintiffs have an alternative theory: They claim that the seller had actual reason to know of the particular purpose for the vaccine and to know of the buyers' reliance on the skill and judgment of the seller so as to come within the literal requirements of the implied warranty of fitness. They rely on evidence that sales representatives of the defendant made regular calls on Dr. Hauser, that they discussed the vaccine, and that "[i]t is reasonable to infer from this fact that the representative was familiar with the vaccination procedures of Dr. Hauser and with the use he made of the vaccine." There is no evidence that the representative had reason to know the proposed use of the vaccine on these specific cattle, or even that it was to be used in circumstances similar to these, that is when other treatments such as worming, castration, and dehorning would accompany the vaccination, or that there would be a possibility the cattle could already be incubating the disease. Any conclusion that the defendant was put on notice of the plaintiffs' particular use is simply too speculative.

It was error to submit the theory of warranty of fitness for a particular purpose.

## II. *The Cross-Appeal.*

The plaintiffs cross-appeal from the trial court's refusal to admit the testimony of a veterinarian called by the plaintiffs and from its refusal to submit strict liability, Restatement (Second) of Torts § 402A, and implied warranty of merchantability, Iowa Code § 554.2314.

■ A. *The Evidence Question.* Plaintiffs assert on cross-appeal that the trial court abused its discretion in excluding the expert testimony of Dr. Jeffrey R. Howlett.

Iowa is committed to a liberal rule which allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge with respect to the issue in question. The receipt of such evidence rests largely in the discretion of the trial court and its ruling will not be disturbed absent manifest abuse of that discretion. The court's discretion is not unlimited. The facts upon which the expert bases his opinions must be sufficient to enable the witness to express an opinion which is more than mere conjecture. Irrespective of the manner in which the opinion question is phrased, the opinion remains such and the trier of fact is at liberty to reject it.

(citations omitted.) *Osborn v. Massey-Ferguson, Inc.,* 290 N.W.2d 893, 899 (Iowa 1980) (quoting *Haumersen v. Ford Motor Co.,* 257 N.W.2d 7, 11 (Iowa 1977)).

We find an abuse of discretion here. Dr. Howlett is a licensed and practicing doctor of veterinary medicine. He has been a speaker at an American Bovine Practitioner's seminar on the subject of post-vaccinal disease. He co-authored an article on the clinical and domestic evaluation of post-vaccinal disease. His interest in the field has prompted extensive reading, tours of vaccine production facilities, and consultations with the people in the industry and at diagnostic laboratories.

An offer of proof showed that he would have testified to the possibility of ways in which contamination could occur through defendant's vaccine production methods.

While others with more extensive qualifications could undoubtedly be found, Dr. Howlett's background was more than adequate. In *Schmitt v. Clayton County,* 284 N.W.2d 186, 188 (Iowa 1979), we recognized the value of "devot[ing] substantial time and effort to the study of" the subject.

Defendant's reliance on *Henkel v. Heri,* 274 N.W.2d 317 (Iowa 1979), for the proposition that an expert's opinion must have

general acceptance in the scientific community is misplaced. "[W]e do not believe that 'general scientific acceptance' is a prerequisite to the admission of evidence, scientific or otherwise, if the reliability of the evidence is otherwise established." *State v. Hall*, 297 N.W.2d 80, 85 (Iowa 1980). That reliability was established here through Dr. Howlett's qualifications and experience and through the factual basis which took his opinion "out of the realm of mere speculation and conjecture." *Osborn*, 290 N.W.2d at 900. Further, the proposed testimony regarding possible sources of contamination in the vaccine was relevant and material to the issues in the case. We cannot find that the exercise of the trial court's discretion here was "a legal one based on sound judicial reasons," *Id.* at 901 (quoting *Dougherty v. Boyken*, 261 Iowa 602, 608, 155 N.W.2d 488, 491 (1968)).

■ B. *Implied Warranty of Merchantability.* Iowa Code section 554.2314, setting out the criteria of this implied warranty, is quoted in Division I of this opinion. That theory requires that a plaintiff prove (1) a merchant sold the goods; (2) the goods were not "merchantable" at the time of the sale; (3) injury or damage occurred to the plaintiff's person or property; (4) the defective nature of the goods caused the damage "proximately and in fact"; and (5) notice was given to the seller of the injury. *See* J. White and R. Summers, *supra*, § 9–6 at 343.

■ In contrast to the fitness warranty under section 554.2315, the warranty of merchantability does not require evidence of a particular purpose or of the seller's knowledge of a particular purpose of the buyer, or that the seller had reason to know the buyer was relying on the seller's skill and judgment, or that the buyer in fact relied upon the seller's skill and judgment. Compare Iowa Code sections 554.-2314 *and* .2315. The court gave no specific reasons for its ruling but merely concluded it was not "conceptually appropriate" to submit the theory of warranty of merchantability.

■ Without elaborating on the evidence, it appears that, when it is viewed in the light most favorable to the plaintiffs, a submissible issue was made out on each of the elements. While the defendant correctly points out that there was no direct evidence of a defect in the vaccine, there was considerable circumstantial evidence to support such a finding, as well as the testimony of four veterinarians who implicated the vaccine.

It was error for the court to refuse submission of this theory, subject of course to the defenses provided a seller under this theory.

■ C. *Strict Liability.* The trial court also refused to submit the plaintiffs' claim of strict liability. The principle is stated in 2 *Restatement (Second) of Torts* section 402A, at 347–48 (1965):

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Apparently, the trial court's refusal to submit this theory was based on a lack of sufficient evidence of a "defective condition unreasonably dangerous." For the same reason as explained in the preceding discussion of the warranty of merchantability, we think the evidence was sufficient to submit the theory.

The defendant has an alternative argument, however. It contends that strict liability is inapplicable because the claim is for a "commercial and economic" loss which, it claims, is not recoverable under strict liability. While this court has not ruled on this specific issue, the defendant relies upon three federal district court opinions applying Iowa substantive law to support its argument: *Sioux City Community School District v. International Telephone & Telegraph Corp.*, 461 F.Supp. 662 (N.D.Iowa 1978); *Midland Forge, Inc. v. Letts Industries, Inc.*, 395 F.Supp. 506 (N.D.Iowa 1975); *Iowa Electric Light & Power Co. v. Allis-Chalmers Manufacturing Co.*, 360 F.Supp. 25 (S.D.Iowa 1973).

Even those cases, however, recognize that direct damage to property is recoverable under strict liability. *See Sioux City Community School District*, 461 F.Supp. at 664; *Midland Forge*, 395 F.Supp. at 515; *Iowa Electric*, 360 F.Supp. at 28. The Restatement expressly allows recovery for damages to the user "or to his property." § 402A(1). *See Hawkeye-Security Insurance Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970) (adopts Restatement section 402A).

The damages in this case, in contrast to the "purely economic loss" by the merchant-plaintiffs indirectly affected by the closing of a defective bridge in *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 128 (Iowa 1984), are based on injury to their own property, the cattle, and the theory of strict liability applies.

The few cases that are factually similar to this one support a claim in strict liability. In *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295 (5th Cir.1971), for example, farmers injected their hogs with a modified live-virus hog cholera vaccine. Most of the hogs died from cholera and the plaintiff's expert testified the deaths were probably caused by the vaccine. The Fifth Circuit upheld a plaintiff's verdict (in a § 402A action) on sufficiency of the evidence grounds on facts somewhat similar to ours.

That court also refused to set aside the verdict on the ground that the plaintiffs had not proven a specific defect in the product. The test was not to be whether a specific defect could be identified, but rather whether the product was unreasonably dangerous. *Id.* at 1302.

Texas specifically has endorsed strict liability where cattle sickened and died following a serum injection. *O.M. Franklin Serum Co. v. C.A. Hoover & Son*, 418 S.W.2d 482 (Tex.1967). A federal district court applying Mississippi law also found "no good reason why strict liability should not be applicable to this case since modified live virus vaccine [for hog cholera] is not an experimental drug, but a well-established one with known capabilities." *Denman v. Armour Pharmaceutical Co.*, 322 F.Supp. 1370, 1374 (N.D.Miss.1970) (plaintiffs failed to prove defect or proximate cause). We conclude it was error to refuse submission of strict liability.

REVERSED ON BOTH APPEALS AND REMANDED.