# IN THE COURT OF APPEALS OF IOWA

No. 24-1992
Filed December 17, 2025

**BLAKE MORMANN, RANDY MORMANN, and JAQUELINE MORMANN,**
    Plaintiffs-Appellants,

**vs.**

**FAIRCHILD FEED AND SUPPLY, INC.,**
    Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Delaware County, Michael J. Shubatt, Judge.

        Cattle owners appeal from the district court's ruling granting a feed supplier's motion for summary judgment. **AFFIRMED.**

        Jeremy B. Hahn (argued) of Roberts & Eddy, P.C., Independence, for appellant.

        Ian P. Bartelt (argued) and Christopher C. Fry of O'Connor & Thomas, P.C., Dubuque, for appellee.

        Heard at oral argument by Greer, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

Blake Mormann appeals from the district court's ruling granting Fairchild Feed and Supply, Inc.'s motion for summary judgment.[1] Mormann claims the district court erred in concluding he could not recover against Fairchild under the theories of breach of implied warranty of fitness for a particular purpose and negligence. Upon our review, we affirm.

## I.    Background Facts and Proceedings

Mormann operates a cattle operation and small farm out of Manchester, Iowa. In late 2019, Mormann met Toby Bender of TCB Consulting. Bender is a livestock nutritionist, who "provides nutritional services and industry expertise to feed mills, producers, [and] companies." The following year, Mormann began working with Bender to set up a mineral program for his cattle. Mormann and Bender also discussed developing a ration including the use of a balancer to increase digestibility and rate of gain in Mormann's cattle. And to "make [feeding] more efficient," Mormann purchased a total mixed ration machine (TMR), in which all feed ingredients are combined into a single, uniform mix.[2]

At that time, Mormann was purchasing feed from Fairchild Feed and Supply, Inc. out of Winthrop. Mormann thought Fairchild would be "a good local resource for him to obtain product from." On November 20, 2020, Mormann and Bender met with Fairchild employee Max Cherry to discuss Mormann's "needs," ask what

---

[1] Blake's parents, Randy and Jacqueline Mormann, are also plaintiffs. Because the facts and proceedings of this case deal primarily with Blake, we reference him as the relevant party, "Mormann," throughout this opinion.
[2] Mormann described a TMR as "like a big blender for cattle"; "[y]ou can dump all your feed in there, in this machine, and then it mixes everything up, and you take it out and feed it to them."

products Fairchild "had on hand," and determine whether Fairchild could provide what Mormann needed "for his operation." Bender inquired whether Fairchild "would be able to provide a half-pound R1200 balancer product." Bender was not concerned about the specific brand, only that Fairchild "carried that type of product." Cherry confirmed that a balancer was available.

After that meeting, Bender created a written ration plan for Mormann, titled "Mormann Grower." The ration plan is essentially a "batch sheet," which lists "corn silage, dry distillers grains, grass hay, corn, and balancer at the different percentages of the total diet across the top margin and then the different batch sizes down the left margin." For example, the first page of the Mormann Grower batch sheet provides as follows:

**Mormann Grower**     C1   0.57 NEg   67% DM

| Batch Size | Corn Silage | | Dry DDG | Grass Hay | Dry Corn | Balancer | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| % in Mix | 38.2% | | | 9.6% | 38.2% | 1.3% | | | | |
| 800 | 306 | | 100 | 80 | 306 | 10 | | | | |
| | 306 | 306 | 406 | 486 | 792 | 802 | 802 | 802 | 802 | 802 |
| 900 | 344 | | 110 | 90 | 344 | 0 | | | | |
| | 344 | 344 | 454 | 544 | 888 | 898 | 898 | 898 | 898 | 898 |
| 1000 | 382 | | 30 | | 382 | 10 | | | | |
| | | | 2 | 612 | 994 | | 004 | 1004 | 1004 | 1 |
| 1100 | 420 | | 140 | 110 | 420 | 10 | | | | |
| | 420 | 420 | 560 | 670 | 1090 | 1100 | 1100 | 1100 | 1100 | 1100 |
| 1200 | 459 | | 150 | 110 | 459 | 20 | | | | |
| | 459 | 459 | 609 | 719 | 1178 | 1198 | 1198 | 1198 | 1198 | 1198 |
| 1300 | 497 | | 170 | 120 | 497 | 20 | | | | |
| | 497 | 497 | 667 | 787 | 1284 | 1304 | 1304 | 1304 | 1304 | 1304 |
| 1400 | 535 | | 180 | 130 | 535 | 20 | | | | |
| | 535 | 535 | 715 | 845 | 1380 | 1400 | 1400 | 1400 | 1400 | 1400 |
| 1500 | 573 | | 190 | 140 | 573 | 20 | | | | |
| | 573 | 573 | 763 | 903 | 1476 | 1496 | 1496 | 1496 | 1496 | 1496 |
| 1600 | 611 | | 200 | 150 | 611 | 20 | | | | |
| | 611 | 611 | 811 | 961 | 1572 | 1592 | 1592 | 1592 | 1592 | 1592 |
| 1700 | 650 | | 220 | 160 | 650 | 20 | | | | |
| | 650 | 650 | 870 | 1030 | 1680 | 1700 | 1700 | 1700 | 1700 | 1700 |
| 1800 | 688 | | 230 | 170 | 688 | 20 | | | | |
| | 688 | 688 | 918 | 1088 | 1776 | 1796 | 1796 | 1796 | 1796 | 1796 |
| 1900 | 726 | | 240 | 180 | 726 | 20 | | | | |
| | 726 | 726 | 966 | 1146 | 1872 | 1892 | 1892 | 1892 | 1892 | 1892 |
| 2000 | 764 | | 250 | 190 | 764 | 30 | | | | |
| | 764 | 764 | 1014 | 1204 | 1968 | 1998 | 1998 | 1998 | 1998 | 1998 |
| 00 | 803 | | | 00 | 803 | 30 | | | | |
| | | 803 | 1073 | 1273 | | | 2106 | 2106 | 21 | |

— Since many factors affect performance actual performance cannot be guaranteed —

The ration plan includes the use of a "Balancer." It does not specify "R1200" or a certain type of balancer.[3] Mormann understood how to use the ration plan, and he sought advice from Bender on how to use the TMR. Bender described the Mormann Grower ration plan as "a pretty conservative ration," and he didn't have any "red flag[s]" with Mormann using it.

Mormann then contacted Fairchild to order the balancer. On November 23, 2020, the following text exchange took place between Mormann and Cherry:

> CHERRY: I got a bag of 10G rumensin here. I'll throw that on and get more coming ASAP. Will have it before you run out of that first bag. . . . I couldn't remember if that ration he had was for 10G or not. But I'm thinking that's the easiest to deal with[.]
> MORMANN: I just looked[.] Didn't have anything specific to use[.]

Mormann did not ask Bender if the Rumensin 10G was an appropriate balancer to use because he "felt confident that was . . . the balancer that [he] needed" after their earlier meeting at Fairchild.

Mormann received the fifty-pound bag of Rumensin 10G from Fairchild and began mixing it into his feed. Mormann only glanced at the label on the bag, which included the following warning: "* * * **CAUTION** * * * . . . . FEEDING UNDILUTED OR MIXING ERRORS RESULTING IN HIGH CONCENTRATIONS OF MONENSIN HAS BEEN FATAL TO CATTLE. . . ."

Had Mormann contacted Bender to inquire if Rumensin 10G was what he needed, Bender would have told him "No."

---

[3] According to Bender, "an R1200 [is] a Rumensin, trade name, or monensin, technical name, which means 1200 grams per ton. At a half-pound feeding rate that would deliver approximately 300 milligrams of monensin per head per day."

Approximately three to four days later, Mormann discovered several of his calves were dead and others were sick. Mormann contacted his veterinarian but continued to feed his cattle the same ration. On November 30, Mormann messaged Cherry requesting more Rumensin 10G because he had run out of the first bag.

Around that time, Mormann contacted Bender about his sick cattle. Bender investigated the issue and noticed a bag of Rumensin 10G in Mormann's barn. Using the calculations based on the contents of the Rumensin 10G bag, Bender created a spreadsheet showing that Mormann mixed in a much greater amount of the active ingredient in the "balancer" than Bender had intended in the ration plan. In Bender's recommended batch, the cattle "would have been getting 180 milligrams of Rumensin per head per day," and in the batches Mormann was mixing, the cattle had "actually gotten 2,142.85 milligrams of Rumensin per head per day." Bender determined "the issue with the calves is Monensin Toxicity."

In November 2022, Mormann filed a petition against Fairchild, raising claims of breach of implied warranty of fitness for a particular purpose and negligence. Relating to the first claim, Mormann alleged Fairchild knew he wanted to purchase a half-pound R1200 balancer "for the purpose of balancing cattle nutrition"; Fairchild knew or should have known that a "substitute" for R1200 "needed to be fit for cattle consumption"; and Fairchild supplied "a product not intended to be used as a substitute" for R1200.

Relating to the second claim, Mormann alleged Fairchild had a duty to provide an equivalent substitute for a half-pound R1200 balancer; Fairchild failed to provide a suitable substitute, failed "to provide oversight and instructions for

proper use of Rumensin [10G]," and failed "to act as a reasonable and prudent feed consultant would act under the circumstances"; and Mormann incurred economic damages of which Fairchild's failures were the proximate cause.

Fairchild moved for summary judgment. With regard to Mormann's claim of breach of implied warranty of fitness for a particular purpose, Fairchild maintained Fairchild did not know Mormann's "particular purpose with respect to the balancer"; Fairchild had no reason to know Mormann was relying on Fairchild's "skill or judgment to select the balancer because [Mormann was] relying on the skill and judgment of Toby Bender, [his] nutrition consultant"; and Mormann "in fact" relied on the skill and judgment of Bender when he purchased the balancer from Fairchild. Relating to Mormann's negligence claim, Fairchild maintained its "relationship to [Mormann] was that of a feed *supplier* which does not give rise to the feed consultant duties," and even if Mormann could establish that Fairchild owed the duties alleged, Mormann's claim "must be dismissed because [Fairchild] is not in breach of such duties and did not cause [Mormann's] damages."

Following an unreported hearing, the district court entered an order granting Fairchild's motion for summary judgment on both claims and dismissed the case. Mormann appeals, challenging the court's rulings relating to both of his claims.

## II.    Standard of Review

> We review summary judgment rulings for correction of legal errors. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. We view the record in the light most favorable to the nonmoving party. And we draw every reasonable inference in favor of the nonmoving party.

*McClure v. E. I. du Pont de Nemours & Co.*, 23 N.W.3d 33, 40 (Iowa 2025) (internal citation omitted).

## III.  Breach of Implied Warranty of Fitness for a Particular Purpose

A warranty of fitness for a particular purpose "is based on a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer." *Van Wyk v. Norden Labs., Inc.*, 345 N.W.2d 81, 84 (Iowa 1984); *see* Iowa Code § 554.2315 (2022).  This type of claim "turns on what the seller had reason to know—both as to the buyer's particular purpose and as to the buyer's reliance on the seller's skill and judgment."  *Van Wyk*, 345 N.W.2d at 85.

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

*Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 637 (Iowa 1988) (citation omitted).

To recover under a warranty for a particular purpose in this case, Mormann was required to show (1) Fairchild had reason to know Mormann's particular purpose; (2) Fairchild had reason to know Mormann was relying on Fairchild's skill or judgment to furnish suitable goods; and (3) Mormann in fact relied on Fairchild's skill or judgment to furnish suitable goods.  *Van Wyk*, 345 N.W.2d at 84.  Mormann did not need to prove he advised Fairchild of his particular purpose in purchasing a balancer, but he needed to prove Fairchild had reason to know of that purpose.

*See Nationwide Agribusiness Ins. v. PGI Int'l*, No. 18-1315, 2019 WL 6894253, at *6 (Iowa Ct. App. Dec. 18, 2019).

The supreme court's analysis of an implied-warranty-of-fitness-for-a-particular-purpose claim in *Van Wyk* is helpful. In that case, veterinarians purchased cattle vaccines "to keep in stock for their general veterinary practice." *Van Wyk*, 345 N.W.2d at 84. The veterinarians used the vaccine to treat the plaintiffs' cattle. *Id*. at 85. After a large number of cattle became sick, the cattle owners sued the laboratory that produced the vaccine. *Id*. at 83. In rejecting the cattle owners' claim against the vaccine producer, the court noted, "The plaintiffs, as owners of the cattle, and the defendant [vaccine producer], had no direct dealing with regard to the vaccine. The decision as to what vaccine to use was made by the buyers' veterinarians, not by the defendant." *Id*. at 84–85. The court declined to assume the vaccine producer had reason to know of the cattle owners' purpose "merely because cattle vaccine is only usable for one purpose," noting "the vaccine may still be used in different ways, some anticipated by the seller and some not." *Id*. at 85–86. Ultimately, the court found, "There was no evidence that the seller had reason to know of any purpose for the plaintiffs' use of the vaccine, other than its ordinary use, or that the buyer was relying on the seller's skill and judgment in providing it." *Id*. at 85; *see also Nationwide Agribusiness Ins.*, 2019 WL 6894253, at *6 (noting the evidence did not show the manufacturer of an excess flow valve had reason to know of the specific use of the hose by the farmer who ultimately purchased it through a third party, where in part, the use was peculiar to the nature of the farmer's business).

Here, the district court found that Mormann's claim failed under all three factors. As the court stated:

> Fundamentally, this claim does not appear to fit the facts of this case any more than they did in *Van Wyk*. Plaintiffs allege that the balancer they purchased from Fairchild was not suitable or safe for consumption by cattle but offer no facts to support this assertion.[4] Consumption by cattle, in the proper amount, is the reason the product exists. In other words, it is the product's particular purpose. The reason the cattle got sick and died is not because they consumed the product, but because of how much of it Mormann gave to them.
>
> Mormann asked Fairchild to sell him a balancer. Fairchild did so. It is undisputed that Cherry communicated to Mormann at that time that he did not know if this was the specific balancer that Bender wanted in the ration, which was formulated after the meeting between the three men at the store several days earlier. Why Mormann did not attempt to find this out from the expert he had retained as his consultant or did not read the clear warning labels on the product itself is not clear. What is clear is that Mormann did not rely on Cherry or anyone else at Fairchild to formulate the ration or to specify the products or amounts of those products that would be used in Bender's recommended feed mix. Said another way, if Mormann himself, with the benefit of having Bender's ration in hand, did not know what kind of balancer he should use or in what amount, how would Fairchild, as a mere seller of the individual component products, know?
>
> If there was a purpose for the product Fairchild sold other than as a balancer, there is nothing in the record to support that Fairchild knew of that particular purpose. Fairchild did not have reason to know that Mormann was relying on it to provide the exact product Bender was recommending; Cherry specifically told Mormann that he did not know if the product Mormann was purchasing was what Bender was recommending. Lastly, there is nothing in the record to support the claim that Mormann relied on Fairchild for the products or amounts of those products to use; Mormann retained the services of Bender for that purpose.
>
> For Plaintiffs' implied warranty of fitness for a particular purpose claim to fail as a matter of law, Defendant only need to . . . demonstrate that Plaintiffs cannot, as a matter of law, establish any one of the three elements. The Court concludes that Plaintiff cannot establish any of the elements. Accordingly, this claim fails as a matter of law.

---

[4] *See Van Wyk*, 345 N.W.2d at 83 (finding "[n]o direct evidence of a defect" in the cattle vaccine).

Upon our review, we find no error in the court's conclusion. Mormann does not dispute that Fairchild provided a product containing the active ingredient he sought, nor does he argue that the product provided by Fairchild would have failed if applied appropriately. *See Renze Hybrids, Inc.*, 418 N.W.2d at 636 (noting the plaintiff conducted "proper application" of the defendant's product to his fields). Mormann and Bender met with Fairchild once, during which Bender inquired whether Fairchild carried the "type of product" Mormann needed. During the meeting with Fairchild, Bender did not provide the amount of product that Mormann would use in his ration plan, and indeed, Bender developed the plan after that meeting.

Mormann was aware that his ration plan did not "specify" a brand of balancer. And he acknowledged that Bender did not recommend a specific balancer. If Mormann would have asked Bender if Rumensin 10G contained the amount of monensin provided for in the batches listed in the ration plan, Bender "would have said no." Mormann explained that his average batch was 4,300 pounds, and he used a scale to measure everything "instead of just eyeballing it." Mormann could not "remember exactly" if he looked at the Rumensin 10G bag before he opened it or measured; "I want to say I glanced at it, and it was all scientific lingo that was above my head that I didn't fully understand."

It is undisputed that Fairchild was neither involved with creating Mormann's ration plan nor viewed the plan. And when Mormann ordered the product from Fairchild, he "didn't ask Max Cherry for input on how much percentage of anything to include in the ration." Mormann was not "expecting" Fairchild to provide a

balancer percentage; he "just asked them for product." Mormann further acknowledged that he did not view Fairchild "as anything other than a supplier of feed." Upon our review, we find no error in the court's determination that Mormann's claim of implied warranty of fitness for a particular purpose fails as a matter of law.

## IV. Negligence

"An actionable negligence claim requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012) (internal citation omitted). Accordingly, to maintain his claim for negligence, Mormann was required to prove that Fairchild "owed a duty to protect him from the harm he suffered." *See Lukken v. Fleischer*, 962 N.W.2d 71, 76 (Iowa 2021).

When analyzing that question, control is an "important consideration," because "liability normally follows control." *Id*. at 77. For example, in *Lukken*, the supreme court analyzed whether a braking-system designer owed a duty to a zip-liner who was injured at a ski resort after a brake failed to stop him. *Id.* at 75–77. The court determined that because the ski resort "decided to replace the [original] braking system," the braking-system designer was not responsible for any "machine- or human-related flaws" in the new system. *Id*. at 77. In other words, the original "braking system didn't fail; it no longer existed." *Id*. Ultimately, the court found the braking-system designer had no control over the renovated braking system; it "owed no duty of care associated with the zip line's braking system after its own braking system had been uninstalled, [therefore] no cause of action for

negligence exist[ed] as a matter of law." *Id*.; *see also McCormick*, 819 N.W.2d at 371–73 (finding a subcontractor owed no duty to maintain safety of the jobsite after it secured the switchgear cabinets and transferred control back to the contractor).

Here, the district court granted summary judgment in favor of Fairfield upon finding Fairfield owed no duty to assure Mormann provided his cattle an appropriate amount of its product. Specifically, the court found Mormann's negligence claim

> fails to meet the requirement that there be a duty between the parties. Whether there is a duty to conform to a certain standard of conduct depends on the relationship between parties. Here, Mormann was an agricultural product consumer and Fairchild was an agricultural product seller. There is no special relationship between the parties created by law. Fairchild never held itself out to be anything but a feed and supply store.
> Plaintiffs argue it is disputed whether Bender ever told Cherry the specific type of balancer he was envisioning that Mormann would use when they all met on November 20, 2020. However, this fact is not material. Bender had not formulated the ration at the time of that meeting. Mormann later texted Cherry that Bender had not told Mormann about "anything specific to use." Mormann ended up purchasing a balancer that was not inherently defective; the reason the cattle got sick and died is not because they were given the product but because of how much of the product Mormann gave them.
> Control is central to the question of duty. Fairchild had no control over Mormann's cattle farming operation, what Mormann used to mix the products he purchased from Fairchild, how he mixed his products, or even how many cattle to feed or whether they had specific nutritional needs. Fairchild did not manufacture ration balancer, nor did it advise Mormann about what type of balancer to use, nor did it advise Mormann how much of it to use. There is nothing in the facts of this case or the law to suggest that Fairchild owed Plaintiffs a duty, or that it breached any duty that might exist.

(Internal citations omitted.)

"Whether a duty arises out of a given relationship is a matter of law for the court's determination." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009).

Upon our review, we find no error in the court's determination that Fairchild owed no duty to Mormann under the circumstances presented here.

We affirm the district court's grant of summary judgment in favor of Fairchild.

**AFFIRMED.**